## TORBERT v. JEFFREY, Appellant.

### Division One, March 29, 1901.

1. **Partnership:** ORAL CONTRACT: EFFECT: INTENTION. In determining whether the relation between the parties to an oral contract constitutes a partnership, their intention governs, as that intention is disclosed, not by the particular expressions used, but by the nature and effect of the whole contract.

2. ———: ———: PARTICIPATION IN PROFITS. Participation in the profits of a business raises a presumption of the existence of a partnership. This presumption is not conclusive, but if not rebutted is sufficient to establish a partnership.

3. ———: ———: ———: CONTRIBUTION OF SKILL, ETC. Plaintiff and defendant associated themselves together for buying apples. Defendant was to furnish the money to make the purchases and pay the expenses of shipping, etc., and was to arrange for a cold storage warehouse, and plaintiff was to put in his labor in preparing the apples for shipment, without any other compensation for either, except defendant was first to be paid back the money ventured by him in the enterprise, and then each was to share equally in the net profits. *Held*, that this was an ordinary partnership.

4. ———: APPOINTMENT OF RECEIVER: PROPERTY IN ANOTHER STATE. In an action in equity between partners, to wind up a partnership business and to settle a partnership account, the jurisdiction of the court to appoint a receiver is not cut off by the fact that a part of the partnership goods in possession of defendant are stored in another State.

Torbert v. Jeffrey.

Appeal from Saline Circuit Court.—*Hon. Richard Field,*
Judge.

AFFIRMED.

*Stewart Taylor* for appellant.

(1)   Plaintiff's cause of action, as stated in the petition,
and as shown by the evidence, did not entitle him to the ap-
pointment of a receiver, because it nowhere appears in the
pleadings or evidence that plaintiff had any title to the prop-
erty itself, or that he had any lien thereon, or that the property
itself constituted a special fund to which plaintiff had a right to
resort in satisfaction of his claim, and for the further reason
that no fraud, or imminent danger, if the immediate possession
was not taken by the court, was shown.   Moreover, the prop-
erty was not within the jurisdiction of the court.   (2)   The
court had no jurisdiction to appoint a receiver.   The mere
filing of a petition therefor did not confer such jurisdiction,
especially when it had no jurisdiction of the *res.*   Miller
Bros. v. Perkins, 154 Mo. 629.   (3)   If no partnership ex-
isted there was nothing to authorize a court of equity, in a suit
for dissolution of partnership, to lay hold of the business, en-
join it, and proceed to wind it up, and the refusal to set aside
the restraining order was error and an abuse of judicial power.
(4)   There was no partnership.   Clifton v. Howard, 89 Mo.
192; Ashby v. Shaw, 82 Mo. 76; Donnell v. Harshe, 67 Mo.
170; Musser v. Brink, 68 Mo. 242; s. c., 80 Mo. 350; News-
paper Co. v. Farrell, 88 Mo. 594; Thompson v. Holden, 117
Mo. 118; McDonald v. Matney, 82 Mo. 358; Newberger v.
Friede, 23 Mo. App. 631; Kelly v. Gaines, 24 Mo. App. 506;
Lockart v. Forsythe, 49 Mo. App. 654.   (5)   The contract
was one of agency and not partnership.   Wiggins v. Graham,
51 Mo. 17; Kelly v. Gaines, 24 Mo. App. 506; Hedges v.

Wear, 28 Mo. App. 575; Newspaper Co. v. Farrell, 88 Mo. 594; Darling v. Potts, 118 Mo. 506.

*Wallace & Wallace* for respondent.

(1) The fact that certain of the partnership property was stored in the warehouse of the Armour Packing Company, in Kansas, did not deprive the court of jurisdiction to appoint a receiver of the partnership effects. This is so for several reasons. This property was under the control of the defendant Jeffrey, who presumably had warehouse receipts therefor. All of the parties were before the court. There were other partnership effects besides the apples stored in Kansas. High on Receivers (3 Ed.), sec. 44, p. 33, also sec. 164, p. 145; Chaffee v. Quidnick Co., 13 R. I. 442; Railroad v. Railroad, 46 Vt. 792; Sercomb v. Catlin, 128 Ill. 556; Langford v. Langford, 5 L. J. (N. S.), ch. 60. (2) The relation of the plaintiff and defendant in this venture was clearly that of partners, and the remedy adopted by the plaintiff was the only one that was open to him. Lengle v. Smith, 48 Mo. 276; Scott v. Caruth, 50 Mo. 120; Plumber v. Troast, 81 Mo. 425; Bank v. Altheimer, 91 Mo. 190; Wifferman v. Stacey, 80 Wis. 345; Ellensworth v. Parker, 62 Ill. App. 650; Carey v. Caldwell, 86 Mich. 570; Farr v. Morell, 53 Hun 31; Dane v. Kempster, 146 Mass. 454; Miller v. Price, 20 Wis. 117; Strauss v. Cann, 83 Ill. App. 497; Setchell v. Foster, 106 Mass. 42; Wright v. Davidson, 13 Minn. 449; Pierce v. Shippee, 90 Ill. App. 371; Couch v. Woodruff, 63 Ala. 446; Emanuel v. Draughn, 14 Ala. 303; Clark v. Ridley, 49 Cal. 105; Robbins v. Lazwell, 27 Ill. 365; Marx v. Stein, 11 La. Ann. 509; Musier v. Trumpbour, 5 Wend. (N. Y.), 275; 1 Bates on Partnership, secs. 18, 28 and 35; Holme v. Hammond, L. R., 7 Exch. 233; Pooly v. Driver, 5 Ch. Div. 458. (3) Even if this should be considered by the court not to be a partnership

in the general sense of that term, still, the plaintiff, under the authority of Seymour v. Freer, 8 Wallace, 202, had such an interest in the property involved as entitled him to the relief sought in the petition.

BRACE, P. J.—This is an appeal from an order of the circuit court of Saline county, refusing to revoke an interlocutory order of said court appointing a receiver. The action in which the order was made was for the settlement of a partnership account, and the property in the possession of the defendant, for which a receiver was appointed, was alleged partnership property. The main question in the case is, whether as to that property the plaintiff and defendant were partners. The only direct evidence as to the alleged contract of partnership is that of the parties themselves, taken by deposition. That of the defendant was first read. His testimony on that subject is as follows:

"Q. Mr. Jeffrey, I will get you to state what you consider the contract between you and Mr. Torbert to be? A. How do you mean that?

"Q. Just what you consider that contract as to buying those apples at Orrick, Missouri, to be between you and Mr. Torbert? A. Why, in the first place, he came to me and said he had some contracts in Orrick, Missouri, or in the neighborhood, for so many apples from certain parties, and after a lot of talk about it and him asking me four or five times to go in, I consented to advance him, not to exceed $1.10 a barrel, and whatever net profits there was, after all expense was paid, he was to have one-half of it.

"Q. Your contract was then that the pay he was to get was to be half what net profits that would be realized after all expenses were paid? A. Yes, sir; he had a contract with those parties for one dollar a barrel and he said he would put in his time. . . . .

"Q. How were they billed when they were shipped to Kansas City by him? A. To Jeffrey Commission Company.

"Q. And were stored immediately at Armour's? A. At Armour's, yes, sir.

"Q. Was anything ever said between you and Mr. Torbert at that time with reference to his having any say-so with reference to.the apples or their sale? A. Yes, sir; he had no right.

"Q. Just state what was the agreement with reference to the handling of the apples between you and Mr. Torbert? A. That I had absolute say about it until they were all sold and to give him half of the proceeds after all the expenses were taken out on a certain amount of them.

"Q. Now, did he ever attempt to interfere with the management of the apples prior to the bringing of the suit, prior to Mr. Wallace coming down to see you a few days before the suit was brought? A. Never.

"Q. Did he ever, prior to Mr. Wallace's visit above referred to, intimate in any manner a desire to have a voice in the management and control of these apples? A. Never.

"Q. In the conversation in making this contract what was said with reference to Mr. Torbert having any say as to the management of these apples? A. At the commencement of it?

"Q. Yes? A. At the commencement of it I said I would advance not to exceed $1.10 a barrel, he to draw on me when the apples were loaded, not to exceed $1.10 per barrel for the apples; draw on me sight draft, bill of lading attached; that I would handle the apples to the best advantage; that he was to devote his time, free of cost, for his interest in the apples, and he agreed to it; when he returned after the thing was all over, I asked him if he could not sell some of them

and he says, 'You have got your money into it and you can do the best you can with it.' ....

"Q. Now, you used the expression that Mr. Torbert was to give his time free and superintend the packing of the apples for his interest in the apples? A. Yes, sir.

"Q. Do you mean that Mr. Torbert was to have an interest in the apples or in the profits? A. In the profits.

"Q. If I understand you, the agreement was that he was to be interested in one-half of the net profits, should there be any, in the apples? A. But that was not in the apples.

"Q. And he was not to have any voice in the management or sale of the apples? A. No, no."

The testimony of the plaintiff on that subject is as follows :

"Q. Now, I will get you to state what the contract between you and Mr. Jeffrey was, or rather state fully the conversation relating thereto? A. You mean previous to the time, the day we made the contract? I can not state exactly the conversation—all of it, but Mr. Jeffrey knew that I had some apples bought down there, and he had spoken about it several times, not in any trade though, as I understood it, at least, but he knew I had some apples bought there, and the morning that this agreement was made I was in his office and he asked me how many apples I had down there, and I told him I did not know, that I had those four orchards, and he then wanted to know again what I was to give for them, and I told him what I was to pay for them—showed him the contracts I had. 'Well,' he says, 'You have got a pretty good thing there,' and he wanted to know why I did not buy more; I told him that I did not like to take hold of any more from the fact that I probably had all that I could handle, or something to that effect, and then he said that he would like to have ten thousand barrels, and he says, 'If you have not the money to

Torbert v. Jeffrey.

handle them, how would you like to go in partners with me; you put in what you have got and I will furnish all the money to pay for them and pay for the handling of them?' I told him that it was owing to what kind of an arrangement we would make, and he said that he would put his money against my time and we would go partners on the deal.

"Q.  Is that all?  A.  Well, we made the arrangement then to go down there.

"Q.  Well, now you have been stating the preliminary discussion, I will ask you to state now exactly what the contract was?  A.  The contract was that he was to furnish the money and to pay for the apples and to pay for the packing, and that I was to have half interest in the business after he got the amount of money he put in it.

"Q.  That was expressly understood, was it, that he was to get out what money he put in first?  A.  Well, he did not say first, he said after he got what money he had in out, that was the agreement, he was to have his money, and then I was to have half of whatever was remaining.

"Q.  Well, that meant first, did you not understand it that way?  A.  No, I did not understand it to be first.

"Q.  Now, I will ask you to state again what the contract was with reference to Mr. Jeffrey getting the money he advanced out of the apples?  A.  Well, the contract was that I was to have half interest in it after he got the amount of money he put in the apples; he did not specify the time he was to get it or anything about that.

"Q.  Well, you used the word "after," did you not, which meant that you were to have a half interest in the apples after he got his money out?  A.  Yes, he was to get his money that he put into them.

"Q.  And then you were to be equal partners?  A.  Yes.

"Q.  You were not to be equal partners before he got

his money out of them, were you? A. Well, it was not specified in that way whether we would, or anything about that.

"Q. Just state again in your own way? A. He was to have his money out of the apples, of course there is no dispute about that.

"Q. Now, were you to share in the apples or in the profits? A. That was stated just as the talk was, I do not know how you would interpret it; that is the conversation; that is the agreement, just as I stated it, that his money, of course, was to be paid back to him.

"Q. Well, now, have you ever had any idea that you were to share in the apples themselves? A. Why, after he got his money out of them, I certainly would share in the apples after his money came out of that, and I consider myself a sharer......

"Q. Was anything said in the original contract about where the apples should be stored? A. I believe there was talk about it; he talked some about the Kansas City Ice & Cold Storage Company, but I believe he said that he had some trouble with them and he would see Armour.

"Q. Was anything said about your having any voice in the management of the apples prior to getting his money out of them? A. It was not specified anything about his getting his money out of them, he did not specify anything.

"Q. Did you say that Mr. Jeffrey was to get his money out of the apples and then after his money was gotten out that you were to be partners in what there was left? A. Why, he said nothing about his money in speaking about them; the word "after" was not used; he was to have his money out of them.

"Q. Was nothing said about managing the apples before he got his money out of them? A. In speaking about the management of the apples? He did not bring up the question of managing the apples.

"Q. I want you to direct your attention solely to the original first agreement, and ask you if anything was said at that time about the management and control of the apples? A. Yes, there was something said about the management and control of them—about the management of them.

"Q. What was said? A. In talking over he said this, that when he got the apples packed......First he had been talking to me in regard to handling dried fruits, whether I knew anything about handling them or not, and talking about wanting me to go to California, and in this talk he said, "While you are running around you can probably help dispose of those apples—to handle them."

"Q. Was that all? A. Yes, all that was really said about the disposal or control of them......

"Q. Mr. Torbert, that contract which you entered into, there was nothing said about just the profits—state just the words now? A. The words, just as near as I could state them, I have stated.

"Q. But I would like to have them again? A. In regard to putting these apples in—in regard to the apples I had bought and what we were going to buy, he asked me, he says to me, 'How would you like to put in what you have got and me furnish the money to pay for all of them and the expenses of packing and go in partners in the deal.'

"Q. Now, Mr. Torbert, you stated, I believe, in the direct examination, that Mr. Jeffrey, when you told him of what you had down there, the contracts that you had, that he told you it was a good thing? A. Yes, sir.

"Q. Then it was not only your labor that was on your side but the contracts you had with them? A. That was a part of the consideration......

"Q. Mr. Torbert, you were here this morning when Mr. Jeffrey said something about you saying to him that he

had the money in there and for him to get it out; I wish you would explain about that and state whether or not it is true? A. I wanted to sell some of the apples; talked to him about it and he said no, do not sell the No. 1's now, they are going to be high, and he said sell the No. 2's, and I asked him what price we had best put on them; he said from $2.50 to $3.00; I told him that we could not sell the No. 2's then at this price. He said that the Wine Saps and Willow Twigs and Grimes Golden that were in the No. 2's were as good as most of the No. 1's that were on the market, and that he would not consent to take any less than $2.50 to $3.00, and as to me telling him that he had his money in the apples and for him to get it out, I never told him any such thing, I never told him anything of the kind."

It further appears in the evidence that in pursuance of the contract thus testified to, the plaintiff shipped to defendant 1,650 barrels of apples, drawing on the defendant for the purchase price thereof, which drafts to the amount of $1,758, with the freight and other incidental expenses amounting in the aggregate to over $2,500, were paid by the defendant. The apples were stored in the Armour cold storage warehouse in Kansas City, Kansas, a small quantity of them sold by the defendant, when this controversy arose, and this suit was brought.

(1)   The character of the contract between the parties is to be deduced from the evidence.

In determining whether the relation between the parties constitutes a partnership, their intention governs as that intention is disclosed, not by particular expressions, but by the nature and effect of the whole contract.

This case belongs to that large class, in which there is an agreement to share the profits of a venture, and nothing is said about the losses.

"Participation in the profits and losses of a joint business

or undertaking affords the usual, and, perhaps, the most cogent test of the existence of an intention to form a partnership. An agreement for such participation is not, however, a conclusive test, and does not absolutely constitute a partnership as a conclusion of law, if other circumstances show that no partnership was intended. It is only prima facie proof, which may be rebutted by evidence of other facts and circumstances." [17 Am. & Eng. Ency. of Law (1 Ed.), 835a; Donnell v. Harshe, 67 Mo. 170; Musser v. Brink, 68 Mo. 242; McDonald v. Matney, 82 Mo. 358; Kellogg Newspaper Co. v. Farrell, 88 Mo. 594; Clifton v. Howard, 89 Mo. 192; Thompson v. Warren, 117 Mo. 118; 1 Bates on Partnership, secs. 25 and 29.]

And as a community in losses is a necessary corollary of a participation in the profits, a partnership may as well be predicated of an agreement to share *net* profits, as of an agreement to share the profits and losses, and the same rule applies. Hence, "participation in the profits of a business raises a presumption of the existence of a partnership. This presumption is not conclusive, but if not rebutted is sufficient to establish a partnership." [17 Am. & Eng. Ency. of Law (1 Ed.), 841, b; Lengle v. Smith, 48 Mo. 276; Phillips v. Samuel, 76 Mo. 658; Fourth Nat. Bk. v. Altheimer, 91 Mo. 191; 1 Bates on Partnership, sec. 30; Corey v. Cadwell, 86 Mich. 570.]

When both parties furnish the capital and are to share in the profits, ordinarily no question can arise as to the existence of a partnership. When one party contributes the capital and the other the labor, skill or experience for carrying on a joint enterprise, such a combination constitutes a partnership unless something appears to indicate the absence of a joint ownership of the business and profits. [17 Am. & Eng. Ency. of Law (1 Ed.), pp. 842-3.] Such absence of joint ownership is indicated when from the whole contract it appears that the

party contributing his services is to receive a share of the profits merely as compensation for his services, as illustrated in some of the cases cited. But it does not appear, from the fact that one part of the business is to be conducted by one of the parties and the other part by the other party, nor by the fact that the capital is to be returned to the partner putting it in before the profits are shared. These are but the ordinary incidents of a partnership.

Applying these principles to the case in hand, after stripping this evidence of redundant matter, and the opinions and deductions of the witnesses and confining our attention to what the parties actually said and did in this business, we find nothing to take it out of the category of an ordinary partnership in a joint venture, to be conducted on joint account, the net profits of which were to be equally divided between the partners.

(2). It is suggested in brief of counsel for appellant that the court did not have jurisdiction to appoint a receiver in the case. As this was an action in equity between partners, to wind up a partnership business, and to settle a partnership account, the only basis for this suggestion seems to be that the apples, a part of the partnership property, were stored in the State of Kansas. There is nothing in this suggestion, which is fully answered by the authorities cited by counsel for respondent.

The judgment of the circuit court refusing to revoke the interlocutory order appointing a receiver is affirmed, and the cause remanded to the circuit court to be proceeded with to final judgment.

All concur; *Marshall, J.*, absent.