JOHN F. CHAPIN and J. WALTER FARRAR v. WILLIAM P. CHERRY, Appellant.

Division One, May 31, 1912.

1. IMPLIED TRUST: Purchase of Land: Payment of Purchase Price: Confidential Relation. In the absence of the payment by plaintiffs of their proportionate share of the purchase price of the land conveyed to defendant, before an implied or constructive trust in their favor will be held to have been created by law, a confidential relation (such as husband and wife, guardian and ward, parent and child, attorney and client, principal

and agent, or) such as a partnership, must have existed between them and defendant.

2. ————: ————: ————: ————: **Partnership: Definite Contract.** Before the plaintiffs, who negotiated with defendant for the purchase of land afterwards bought and paid for by defendant, are entitled to have a constructive or implied trust declared in their favor, on the theory that a partnership had been entered into by them and him for the purchase of the land prior to the date of the purchase, they must establish a partnership agreement to which all fully agreed, which embraced all the propositions pertaining to the purchase and handling of the property, with no element of the contract left open. And an agreement of some kind between plaintiffs and defendant to purchase a small tract of city property, upon no proposition of which the minds of all at any time during the negotiations met and agreed—in which, for instance, it was not definitely agreed how plaintiffs were to pay for their aliquot interest, what interest if any they were to pay if defendant furnished all the purchase money, how he was to be secured, when he was to be repaid, whether or not the lots were to be sold, or if sold how defendant was to be reimbursed, and how the losses if any were to be borne, and whether or not one of the plaintiffs was in fact to be a partner—is too indefinite, equivocal and conditional to establish a partnership relation, or to be used as a basis of declaring an implied trust existed between plaintiffs and defendant which authorizes a decree that he held the title of an undivided two-thirds of the property in trust for plaintiffs upon their payment to him of two-thirds of the purchase price. At best such facts show that the parties were simply consulting among themselves about purchasing the property as tenants in common, with no thought of forming a partnership for that purpose.

3. **PARTNERSHIP: Existence: Proof.** One of the essential elements of a partnership is to know who is to furnish the money with which the partnership business is to be transacted. The law permits every person to select his own partners, and never presumes the existence of a partnership, but requires those who assert its existence, especially as between themselves, to prove it by the clearest and most positive evidence.

Appeal from Jackson Circuit Court.—*Hon. John G. Park,* Judge.

REVERSED AND REMANDED (*with directions*).

*James R. Page* and *Conkling, Rea & Sparrow* for appellant.

(1) Respondents' action is one to establish an implied trust. A careful review of respondents' amended petition in this cause discloses that the pleader therein attempts to state facts tending to establish a trust. No other theory is presented by the petition or the evidence. There is no claim of a declaration in writing signed by appellant, hence no express trust is established or sought to be established. The sole and only kind of a trust sought to be established by respondents is an implied or constructive trust, and it was on the theory that such a trust was created between the parties hereto that respondents tried their case. (2) A confidential relation must exist before an implied trust is created. An implied or constructive trust never arises except where the relation between the parties is a confidential one, such as husband and wife, parent and child, guardian and ward, attorney and client, principal and agent or partner and partner. If any confidential relation existed between respondents and appellant, it was because a partnership had been created. Respondents' counsel, recognizing this, have framed their petition on the sole theory that a partnership trust existed. (3) Did a partnership exist? Before there can be a partnership, there must be a contract between the parties to enter into a partnership, and before there can be a contract the minds of all the parties must assent to the same thing, in the same sense, at the same time, and the mutual assent must be to all the propositions, and unless the minds of all the parties meet at the same time, and on the same terms, there can be no contract between them. So long as any matter forming an element of the contract is left open the contract is not complete. Green v. Cole, 103 Mo. 70; Sutter v. Raeder, 149 Mo. 297. For there to have been a concluded contract between these parties, there must have been a definite proposal on the one hand,

and an acceptance thereof on the other, and this acceptance must have been unequivocal, unconditional and without variance between it and the proposal. Strange v. Crowley, 91 Mo. 287; 30 Cyc. 349. General remarks occurring in a conversation between two or more parties are not sufficient evidence of a partnership agreement. Price v. Edwards, 11 Mo. 524. Nor will a mere agreement to participate in the profits and losses necessarily constitute a partnership between the parties so participating. McDonald v. Matney, 82 Mo. 358. The formation of a co-partnership is one of intention by all parties thereto, which must be arrived at from the contract itself, and surrounding circumstances. Mackie v. Mott, 146 Mo. 230; Hazell v. Clark, 89 Mo. App. 83. (4) The quantum of evidence offered by respondents falls far short of that required to establish a trust of any kind. The burden of showing, not only by a preponderance of testimony, but beyond a reasonable doubt, an implied trust, was upon respondents, and they wholly failed to sustain it. Bunell v. Nester, 203 Mo. 465; Derry v. Fielder, 216 Mo. 192; Stevens v. Fitzpatrick, 218 Mo. 725; Brinkman v. Sunken, 174 Mo. 715; Garrett v. Garrett, 171 Mo. 155. (5) Respondents' proof wholly fails to sustain the allegations of their petition. They have offered no proof tending in any manner, however remote, to show fraud on the part of Cherry. Fraud is an affirmative fact to be proven. Hardwicke v. Hamilton, 121 Mo. 473; Lumber Co. v. Crommer, 202 Mo. 504; Hoeller v. Haffner, 155 Mo. 589; Lewis v. Land Co., 124 Mo. 672.

*Finley & Lyons, William R. Thurmond* and *J. Walter Farrar* for respondents.

(1) Every relation in which the duty of fidelity to each other is imposed upon the parties by the established rules of law is a relation of trust and confidence. Witte v. Storm, 236 Mo. 470; Trice v. Comstock, 121

Fed. 620; Mechem on Agency, pp. 445, 456; Ins. Co. v. Smith, 117 Mo. 261; Davis v. Hamlin, 108 Ill. 39; Grumley v. Webb, 44 Mo. 444; Eoff v. Irvine, 108 Mo. 378; Harrison v. Craven. 188 Mo. 608. (2) A constructive trust, or trust *ex maleficio,* arises by operation of law from a confidential relation. Pomeroy, Eq. Jur., secs. 1044 and 1053; Perry on Trusts, sec. 166; Bispham's Equity (5 Ed.), sec. 218; Harrison v. Cravens, 188 Mo. 590; Miller v. Ferguson, 57 S. E. (Va.) 649; Peterson v. Hicks, 86 Pac. (Wash.) 634; Trice v. Comstock, 121 Fed. 620. (3) The testimony sustains the allegations of the petition and establishes a trust. Grumley v. Webb, 44 Mo. 444; Rogers v. Rogers, 87 Mo. 257; Leahey v. Witte, 123 Mo. 207; Witte v. Storm, 236 Mo. 470.

WOODSON, J.—This suit was instituted by the plaintiffs against the defendant to have the latter declared a trustee for the former in and to an undivided two-thirds of a tract of land, containing four acres, in Kansas City, Missouri, alleged to have grown out of a fiduciary relationship that existed between them.

At the beginning of this controversy the defendant was president and general manager of the Cherry-Tilden Live Stock Commission Company, at Kansas City, with its office at the Stock Yards. The plaintiff Chapin was a speculator at the Stock Yards, that is, he was buying and selling live stock on his own account in the yards; and the plaintiff Farrar was a dealer in speculators' paper, that is, he loaned money to speculators, and he is now a practicing attorney at law in Kansas City.

In as much as this is an equitable proceeding, and must be determined anew, by this court, from the evidence introduced, giving due consideration to the findings of the trial court, it becomes necessary to state briefly, at least, the principal parts of the testimony of the plaintiffs and defendant, they being the three

parties to the transaction under consideration. And in doing so, it should be borne in mind, that there was but one conversation ever had between all three of the parties regarding the proposition to purchase the property by them, and that took place on the day the three went out to the property, on a street car, for the purpose of viewing it, which will be specially noticed later.

The principal parts of plaintiff Chapin's testimony in the case, is as follows:

"Q. Now, after you got out there to the land, what did you do? A. Why, we looked the ground over and paced it off.

"Q. Did you go all over it? A. Yes, sir.

"Q. Well what did you say? A. I told Mr. Cherry it could be bought for $5000.

"Q. What did he say? A. Mr. Cherry thought it was a bargain.

"Q. What did Mr. Farrar say? A. Mr. Farrar thought so, too.

"Q. I don't want to know what he thought. What did he say? A. Mr. Farrar said, 'We will buy this ground.' . . .

"Q. And then you said, 'I think the land ought to be bought?' A. I didn't say anything about it.

"Q. You didn't say anything? A. I didn't make any remark. I says: 'It can be bought for $5000.' Mr. Cherry says: 'We will buy this piece of ground.'

"Q. Mr. Cherry repeated right after you, 'We will buy this piece of ground.' A. Yes, sir; it was a general conversation and agreement made right there on the ground.

"Q. I don't want to know what the general conversation was. I want to know what each one of you gentlemen said about it. A. Well, I can say, Mr. Cherry said: 'We will buy this ground together, we will go and buy together.'

"Q. That was his language, 'We will go and buy this land together,' was it? A. Well, he says, 'This ground looks very cheap; it will double itself.'

"Q. That is what he said, isn't it? A. 'And it is worth ten dollars a foot or more.' . . .

"Q. Now what was said about paying for it? A. What was said?

"Q. Yes. A. Well, I don't know as there was anything said. We didn't have much conversation with Mr. Cherry in regard to paying for this ground at all. I was looking after my part of it. Says I: 'I can handle my end of it by having a little time to dispose of some little property I have got. I can barely pay for mine.'

"Q. Your understanding was that you were to pay the cash for your part of it, wasn't it? A. There was no understanding at all, sir.

"Q. What understanding did you have about it as to the payment of it? A. *We didn't get that far along in the trade. We hadn't bought it.* . . .

"Q. So far as you were concerned, Cherry was not going to furnish the money for your part of it? A. Mr. Cherry, as far as I was concerned, I hadn't made any arrangements with him; no, sir.

"Q. If there was any agreement out there between you gentlemen that Cherry was to furnish all the money and you to owe him your proportionate part, you didn't understand it that way, did you? A. Yes, Mr. Cherry volunteered in his conversation, he says: 'I have got some idle money and we will buy this property.'

"Q. I will ask you if when your deposition was taken, this question was asked you and this answer given: 'Q. How much money were you to furnish? A. My third of the money, I suppose. Nothing was said. A man would have to put up his money if he got a third interest in it.' Was that question asked you

and that answer given? A. I think that is right, if that is the way it is there.

"Q. Was that answer true? A. I expected to pay my part of it. I don't expect any man is going to carry me on a real estate deal without security, or without putting up my money on it.

"Q. That is what I am trying to get at. Your understanding of it was that you were to pay it, go in together on it, and each one furnish your proportionate part of it in cash, wasn't it? A. Why, we were to pay for it, I suppose; yes, sir.

"Q. That was your understanding, and you were making arrangements to put up your third of the money in cash, were you not? A. Yes, sir, after we had it bought, but we never had it bought. . . .

"Q. And Mr. Cherry never was to put up any money for you? A. I never asked him to put up a cent for me. If he came to me after we had made the contract I would raise my part of the money. . . .

"Q. I will ask you if the following questions were asked you and the following answers given: 'Q. Now, in your conversation with Mr. Cherry out there, were you to put up your third of the money? A. Certainly I was. Never had any conversation to the contrary. I didn't speak to Mr. Cherry about putting up any money for me or for us. Q. Did Mr. Cherry ask you out there if you had the money to pay for your third? Did you ever have any conversation with him about putting up the money to go out there? A. No, sir. Q. Did you ever ask Mr. Cherry to put up the money? A. No, sir.'

"Q. Were those questions asked you and those answers given? A. Yes, sir.

"Q. Were they true? A. Yes, sir. . . .

"Q. I will ask you if the following questions were asked and the following answers given: 'Q. Now, was Mr. Cherry to furnish the $4500 and you and Mr. Farrar to owe him each one-third of the purchase

price? A. I don't think so; no, sir. I didn't understand it that way at all; I know I was preparing myself to pay for my part of it.' Q. Was that question asked and that answer given? A. Yes, sir.

"Q. Was it true? A. Yes, sir.

"Q. And is it true now? A. Yes, sir.

"Q. I will ask you if the following questions were asked and the following answers given: 'Q. You say that Cherry said something about having some idle money? A. Cherry made a remark that he had some idle money that he had no use for at the present time; that in a few days he would have some from Illinois. Q. Did he offer to let you have that money without interest? A. No, sir. Q. Did he offer to use that money to buy land? A. Not to my knowledge. Q. Did he request to be allowed to buy the land with that money? A. No, sir; he did not. Q. Wasn't something said to you there about Cherry advancing the money and you paying him the interest? A. No, sir; I don't think so. Q. Wasn't there anything said there about Cherry advancing the money? A. No, sir, I don't think there was. For I know I was preparing to buy my share if we bought it.' Q. Were those questions asked, those answers given? A. I think they was, sir.

"Q. Were they true? A. They were true.

"Q. I will ask you if the following questions were asked and the following answers given: 'Q. Is it true that he proposed to advance the money and you offered to become indebted to Cherry in that amount? A. No, sir; I don't think so. Q. Did Mr. Farrar offer to become indebted to him in that amount? A. I can't say. Q. Did he do so in your presence? A. No, sir. Q. Did you offer to owe Cherry a debt for your part of it? A. No, sir. Q. I understand you were able to raise it? A. I was able to raise my part of it. Q. Did you tell Farrar that you would owe Cherry a debt? A. No, sir. Q. Did you tell anybody that you would

owe Cherry a debt for the money? A. No, sir. Q. Did you propose to Cherry, either through Farrar or anybody else, to owe Cherry for this? A. No, sir.' Q. Were those questions asked and those answers given? A. Yes, sir.

"Q. Were they true? A. Yes, sir."

After testifying to their visit and inspection of the land, the value thereof, the profits that could be made out of it, etc., the court asked Farrar this question:

"Did he (Cherry) mention any time in which you could double the money? A. I think not. I said we had decided to buy this land and pay $1500 down on it and then plat it and sell it out in lots. Mr. Cherry said: 'Now, I tell you, I just disposed of some property in Illinois, and I have some idle money that will be here in a few days. The way for us to buy this land is for us to buy it for cash and I would like to put the money in there and you can pay me interest on it till you can pay your part,' or something to that effect. I said, 'I can pay my part of it now. Mr. Chapin has some property down near the Southwest Boulevard on which he can realize enough to pay his part, but if you want to furnish the money we will pay you interest on our part and we will go ahead and buy this land.' He says, 'All right.' "

Continuing, Farrar testified:

"Q. Now, this agreement that you testify to with Mr. Cherry was made voluntarily, all of it? A. Yes, sir.

"Q. What rate of interest did Cherry say he would charge you for that money? A. I don't recall that the rate of interest was mentioned.

"Q. Do you mean to tell me there was an agreement that this man should loan you money without the rate of interest being specified? A. Yes, sir.

"Q. What time did he say you could have the loan

for? A. It was not decided as to how long it should be.

"Q. Let me see: The rate of interest was not decided? The term of the loan was not decided? Is that right? A. Yes, sir.

"Q. And what security, if any, did you agree to give him? A. Nothing said about the security to be given. He asked the privilege of putting up all the money. He said 'You folks can pay me interest on it.' We were leaving that to him, as to what was reasonable. That is all we were expected to do. . . . .

"Q. When you were out on that inspection trip, and this agreement that you claim was made, was there any talk about mortgaging the tract? A. The first part of our talk that was the—when we told Mr. Cherry how we could buy it, $1500 down and give a mortgage on the tract for the balance, I said we ought to have that mortgage so we could release the lots when we sold a lot.

"Q. Did Mr. Cherry object to clouding the title that way? A. Mr. Cherry said that was not a very satisfactory way to have the title; that he had this idle money and we had just better buy it and pay the cash for it and he would furnish the money and we would buy it that way. . . .

"Q. What agreement did you come to there about how much was to be paid for it? A. We figured to buy it for five thousand dollars, if we couldn't buy it for any less. We were going to buy it as cheap as we could. Q. What agreement did you come to there at that time—were you to buy for five thousand dollars cash, or go find out about it? A. No, Mr. Cherry says the way to do is this: 'You can generally buy to better advantage if you buy cash, then you can do as you please with it after you buy it.' I says, 'You have had more experience in this kind of business, and you go and buy it for us, and see what you can do.'

"Q. You didn't come to any agreement at that time, just how you were going to do it? A. No, sir; we didn't know exactly what it could be bought at, none of the details.

"Q. When he suggested there that it ought to be bought for cash, did he ask anything, if you fellows would put up your proportionate part? A. I don't remember just how that came up, but in the conversation Mr. Cherry said, 'Well, now, I tell you, I have got some idle money'—I don't remember whether he said $5600 or $8600; I think it was $5600—was coming in in a few days; he didn't have any place for it and would like to have it invested. We had been talking about buying $1500 down and make a loan on the balance. He said he could furnish the money for all of it and we pay interest on our part. I said to him: 'Now, if Mr. Chapin is secured on his part he could raise the money and I can pay my part, but it would suit me a little better to pay it a little later. I have money tied up out in Kansas.'

"Q. Isn't this what you told him: You were using your money in your business there, and needed the money in your business, and had some money invested in cattle out in Kansas? A. I told him it suited me better to make a loan on it. . . .

"Q. Did you tell him how you would secure him for your part? A. No, he just said, 'I will furnish all the money and you folks can pay interest on your part.'

"Q. You hadn't come to the point in the agreement yet where you were to furnish any security? A. No, I told him that Mr. Chapin had property that he could put up and make good his part and I could fix mine, either pay it or make satisfactory arrangements.

"Q. You didn't conclude at that time whether you would pay it or owe him—would fix it up? A. Well, it was practically concluded. . . .

"Q. Now, do you mean to say that Cherry was to buy the land and no arrangements had been made whether you were to owe him, whether you were to pay him a proportionate part, or whether or not you were to give him any security for your proportionate part, if you didn't pay him? A. We first talked of just going and buying the property, each fellow putting in his part. That was understood when we talked about the loan part. Mr. Cherry said he would furnish the money for all of it. We said all right.

"Q. How much interest were you to pay? A. I would not say for sure whether the rate of interest was discussed or not. I had in mind it was six per cent. Whether it was discussed or not, I do not know.

"Q. How long were you to owe it? A. That was not decided. . . .

"Q. What, if anything, was said about losses? A. We were not figuring on any losses.

"Q. Nothing whatever said about losses? A. No, we were not figuring on that at all.

"Q. Did Mr. Cherry tell you at the time he told you the land couldn't be bought for a while, that he wouldn't take Mr. Chapin in on the deal at all? A. No, sir.

"Q. What did he tell you about Mr. Chapin, if anything? A. He said we had better cut Chapin out of this agreement; 'there is no use for us to give him a third of that good deal out there;' that 'he isn't prepared to put up his money, and I don't care to carry his part of it; I will take care of you, but I think we had better cut him out; we can give him a commission for putting us on to it.' Then I said: 'Now, I think Mr. Chapin will be a good man for us to keep in this agreement and carry out as we have contemplated and have to sell the lots, as he is a pretty good rustler.' Mr. Cherry said: 'We can put him out there and give him a commission for selling the lots and he can get good

pay for his work and we can handle it ourselves. There is no use dividing up with him.'

"Q. What, if anything, did he tell you about Chapin not being the kind of man he would want to go in partnership with? A. Something was said that he didn't want to take his property as security, something of that kind; didn't say anything about the man, particularly, that I know of.

"Q. To refresh your memory, I will ask you if Mr. Cherry didn't say to you that he wouldn't go in a deal of that kind with Chapin at all, as he wasn't the kind of a man he would want to form a partnership with, but he was willing to go in with you? A. No, sir. He said he was willing to carry my part of it.

"Q. But he wasn't willing to carry Mr. Chapin's part? A. No, sir."

Among other things, Cherry testified:

"Q. Now, when did you first learn, Mr. Cherry, that this Orton tract of land was for sale? A. I learned about it—about this particular tract of land—along the last, along the middle, about the middle to the last of March, 1905, through Mr. M. Gilmore, of Great Bend, Kansas.

"Q. What business is Mr. Gilmore in? Who is Mr. Gilmore? A. Mr. Gilmore is ex-sheriff of Barton county, Kansas, and at the present time owns and lives on a ranch of eleven hundred acres near Lyndon, Kansas.

"Q. Is he here? A. He is present.

"Q. When did you next hear anything about this Orton tract of land? A. The next I heard anything about the land was along about the last part of April, 1905: Mr. Chapin came to my office and was telling me about this four-acre tract at Thirty-fifth and Genesee.

"Q. Well, what did he tell you? A. He wanted me to go out and look the ground over with a view of buying it.

"Q. When he came to your office there the first time, what did you say to him? A. I told him I was very busy at that time in the prosecution of my commission business and didn't have time to go out and look at any property.

"Q. What did he say? A. He said he would call again and see me.

"Q. Did he call again? A. He called again along the last of that week, as near as I can remember, and wanted to know if I could go out and look at the property. I told him I was not very busy and I could go, and he said Mr. Walter Farrar wanted to go out at the same time.

"Q. Did you three go out to look at the land? A. Yes, sir.

"Q. Now, when you got out there on the land, what conversations took place between you three? A. Well, when we went out there, we glanced over this four-acre tract, and then went over to the Mellier tract, just north of it, that was then on sale.

"Q. Well, what conversation, if any, next took place between you and the two plaintiffs out there? A. Well, we looked over the four-acre tract and I told Farrar and Chapin that if we decided to buy the property, after we saw the agent and got a price on it, I would only want to buy it on one basis.

"Q. Now, just a moment. When did you first learn that they wanted, if at all, that they wanted all three of you to buy the land together? A. Out there on the ground. I never knew until I got on the ground that they had any idea of wanting an interest in the property.

"Q. How did you learn that all three wanted to buy the land? A. Chapin stepped up and said he would like to have a fourth interest in it, and Farrar spoke up and said he would like to have a fourth interest in it. Mr. Chapin said that he didn't have any money and that he could only buy it one way, and that

would be to give a mortgage back on the property, and that he would be willing to give me a mortgage on the lot on Madison Avenue as additional security.

"The Court (interrupting): Who said that?

"A. Chapin. Farrar told me that all the money he had was invested in his business, paying for speculators' stuff, and at that time his account was overdrawn at the bank, and that he did not wish to take what little money he had in his business to invest in real estate. He said he had some money invested in some cattle out in Kansas, but they were not ready for the market at that time.

"Q. Well, now just go ahead and tell all that took place, all the conversation between you three gentlemen out there that afternoon? A. I told them, after we got down on a price on the property and saw what it could be bought for, that I could furnish them the money to buy the property, provided a certain deal went through in Illinois on a sale of a farm, but there had been some complications come up in the title to the farm, and I was not certain whether the deal would go through or not, but if I furnished the money, they would have to satisfactorily secure me on the outside, as I would not take a mortgage back on this property. I told them that I wanted this property clear, so when it was platted, there wouldn't be any cloud on any of the lots, and we could make such terms as we thought advisable when the lots were sold.

"Q. What did they say to that? A. They wanted to give a mortgage back on the property and have me make a partial release as the lots were sold and turn over the purchase money and notes in the liquidation of their debt, as I sold the lots.

"Q. What did you say to that? A. I told them that I wouldn't do that at all.

"Q. Did you tell them why? A. Because I regarded a partial release as dangerous to the original mortgage, and it would have to be carefully drawn in

the first place in order to properly release the lots, and in the second place, in making so many partial releases, it might invalidate the original mortgage, and further I told them that by that plan I would be getting a lot of little purchase money notes that would be difficult to collect, and some of them perhaps never would be collected, and it would cost me a vast amount of trouble, and if the property sold for a sufficient amount to pay the debts—their debt to me, why, then, I would be holding a lot of little notes and they would have what property was left clear to them, and I refused to do it.

"Q. Well, then, what further took place out there? A. Then the next question came up—they said it was getting late, nearly supper time and we would let the loan business drop and they could see me about that afterwards, after we saw what the property could be bought for.

"Q. Did you know what the property could be bought for at that time? A. I didn't know positively.

"Q. Did they tell you what it could be bought for? A. I am not certain about that, but I am under the impression that Chapin said it had been priced to him at $5000 by Mr. Halsey."

He then testified that the property was extensively advertised for sale by signs posted up at various places on the property.

"Q. Well, when did you learn that Brown, Harding & Brown had the property for sale, if you did learn that? A. Mr. Chapin told me so at the office before we went out there. . . .

"Q. Did he come down? [Meaning Mr. Brown, the senior member of the firm.] A. He came down and I had a talk with Mr. Brown and I asked—made known to him my business, that I was up there to get a price on this Orton four-acre tract.

"Q. Well, what did you find out about it, if anything? A. He said he could not give me a price, as

he had never seen this particular tract of land, that he would have to go out and make some investigations of the values before he could make any price. He said that he had been the attorney for the Orton people when they formerly lived at Kansas City a number of years, and knew the family quite well, and he was satisfied that title could not be made to that property at this time on account of a minor heir. He further said that this minor heir, to the best of his recollection, would not be of age for over a year. I then stated it would be useless for him to go out and make any investigation about the property, if a good title could not be made, and that was about all that was said.

"Q. Well, then, what did you do? A. Well, I left the office and went on down to my place of business.

"Q. When did you next see Mr. Farrar or Mr. Chapin, if you did see either one of them, and which one of them did you see? . . . A. The following day early in the morning I saw Mr. Chapin.

"Q. Where? A. Down in the yards. Not in the building, but in the yards. I told him what Mr. Brown had to say about this property and also told him about the minor heir, and that good title could not be made. I was very busy that day looking after our commission business, and went up to Farrar's office the next day following and told him the conversation that I had had with Mr. Brown, and incidentally remarked that if the property could have been bought I would not take in John F. Chapin as a partner, as I did not consider him financially responsible, and that I would not make a loan, that he was not the kind of a man that I wanted to form a partnership with; and Mr. Farrar said that he would not go into partnership at all unless we took in Chapin, as he considered he would be a good man to sell the lots, as he lived down on the Southwest boulevard and was well acquainted with all the poor people down there, and these lots would have to be sold

to the poor people, and I told Mr. Farrar there and then if that was the way he looked at the matter and wouldn't go in without taking Mr. Chapin, that we would drop the entire matter, and I got up and left the office.

"Q. Now, do you remember when that was, what day that was? A. That was the third morning after we had went out and looked at this property.

"Q. Now, did you have any further conversations with either Mr. Chapin or Mr. Farrar in regard to the land up until the time you bought the land? A. Just one thing I wish to add right in that same conversation. Before I left the office I told Mr. Farrar that if he wished to go in partnership with me and buy this land in case that it could be bought at any future date, that I would furnish the money for his one-fourth, for a one-fourth interest, provided he would properly secure me on the outside of the property, or if he wished to take a half interest, I would take the other half interest, and I would furnish the money for his one-half interest if he would secure me outside of this property.

"Q. What did he say? A. He never offered to secure me, never offered to furnish any money at that time, or any other time.

"Q. Now, after that conversation did you at any time up until the time when you bought the land, or contracted to buy it, have any further conversation with either Mr. Chapin, or Mr. Farrar about it? A. No, sir.

"Q. Now, did you after that time contract for this land out there? A. Yes, sir.

"Q. Now, when was that, if you remember? A. The 21st day of June, 1905.

"Q. Now, tell the court how you came to contract for the land at that time? A. I went up to Brown, Harding & Brown's office, as they had succeeded to the practice of the old firm of Dodson & McCune, to ascer-

tain when a lawsuit would come up that was then pending here in one of the divisions of the circuit court—

"Q. At that time were you acquainted with Mr. John T. Harding? A. I was not. Never saw the man to know him.

"Q. Were you introduced to him there that day? A. I was introduced to him by young Mr. Harris that had formerly been connected with the law firm of H. L. McCune. I don't know the style of the firm, he was in Judge McCune's office.

"Q. Now, how did you come to contract for the land there that day? A. After we got through talking about the lawsuit, which I went up there to see about, Mr. John T. Harding told me he had heard that I was—I had made some inquiry about the Orton tract, and wanted to know if I didn't want to make a bid for it. He said that he believed that a curator could be appointed here in Kansas City to represent the interests of this minor heir, and that good title could be made, and he wanted me to make a proposition, a cash proposition for the property conditionally with the understanding that after he wired or wrote to the parties in Washington about the proposition, that if not accepted that he would refund the amount I paid down on the contract, and there would be no deal.

"Q. And in accordance with that contract there with him at that time you afterwards became the owner of the property? A. Yes, sir.

"Q. Now, when, if at all, did you have any further conversation with either Chapin or Farrar about this property that you had bought? A. On the 18th day of May, 1906, sometime after I had gotten deed to the property, J. Walter Farrar and Mr. Bayless called at my office. When I saw them come in the office I took it for granted that some of my men or some of the men in the employ of the Cherry-Tilden Commission Company had did something wrong in violation

of the rules of the Traders' Exchange, and they had come in to interview me.

"Q. Well, what conversation then took place? A. Farrar stepped behind the counter where I was addressing some envelopes, and the first question he asked me was, wasn't that minor heir Orton—wasn't that Orton heir of age yet? I said, 'I could not say. All I know is what Mr. Brown, Senior, told me at the time I was up to his office.' The next question he asked me if I didn't think a guardian could be appointed out in Oregon for this minor heir. I says, 'I don't know, I am not familiar with the laws of Oregon, and don't pretend to be an attorney.'

"Q. Well, just go ahead now and state the conversation. A. He asked me if it was not the understanding that he and Chapin and myself was not to buy that property. I answered, no, sir, we had never entered into any partnership agreement, 'and did not I tell you when I came back from Mr. Brown's office that I would not go into partnership with John F. Chapin at all, that I did not consider him financially responsible, that I would not make him a loan, and that he was not the kind of a man that I wanted to form a partnership with?' And he said, 'Yes, sir; you did.' He said then, 'Isn't it a matter of fact that you bought this property along in the summer and got a deed for it along in December?' I says, 'I bought this property or contracted for it on the 21st day of June, 1905, and I got the deed to the property in January, 1906.'

"Q. Well, was there anything else said there that you remember between either of you? A. He then asked me if I had made any improvements on the property. I told him that I had had some wood cut since I had gotten my deed.

"Q. Go ahead and tell it all, if anything else happened there. A. That was all that was said, excepting he wanted to know if I would make him a deed to a two-thirds interest in the property if he would pay

me two-thirds of what I paid for it and two-thirds of the money I had expended in repairs or improvements, and I told him that the property was not for sale.

"Q. At the time that Mr. Farrar and Mr. Bayless came into your office, who else was present, if you remember? A. Mr. Wait was sitting to the right of me keeping books. That is our bookkeeper, of the Commission Company. And Mr. H. B. Parks and John Chorn, our cattle salesmen, was out in the office."

I. After a careful reading of this record, which contains more than two hundred pages of printed matter, we are of the opinion that the testimony of the parties to this suit, previously set out, together with the testimony of other witnesses introduced, fully establishes the facts of the case to be as follows:

The evidence is contradictory as to who first called the defendant's attention to the tract of land in controversy, and suggested to him that there was a bargain in it. Some of it tends to show that the plaintiffs did so, but we are of the opinion that the clear preponderance thereof shows that one Gilmore of Great Bend, Kansas, first spoke to him about it. But be that as it may, we attach but little importance to that fact, for the simple reason that the plaintiffs were the first to induce him to go and look at the land.

The plaintiff Chapin, who, in addition to being a speculator in livestock, was also somewhat of a "curbstone broker," that is, was engaged in selling lands and obtaining options upon real estate in and around said city, quite frequently solicited the defendant to purchase different tracts, but it seems that he was never successful. That on or about April 15, 1905, he visited the office of the defendant, and told him of this four-acre tract of land known as the Orton tract, located at Genessee and Thirty-fifth streets, and wanted him to look at it and buy it.

At first defendant supposed that Chapin was an agent and was trying to sell the land to him for the owner, but he refused to go and see it because he was busy. Subsequently, Chapin returned to the defendant's office and again took up the question of purchasing said tract, and told him that the plaintiff Farrar wanted to look at it. Thereupon all three of them took a street car and went out to view the land.

After viewing the same, they made some inquiry of parties living in that vicinity as to values of land in that locality. After some consultation they concluded that the land was worth about $1000 an acre. Thereupon Chapin said that he would like to take a fourth interest in it, and Farrar said he would like to have a like interest.

Chapin gave them to understand that he did not have the money with which to pay for such interest and said that the only way in which he could buy it would be to give a mortgage on his interest for the purchase price. Farrar said that his money was invested in his business, that his bank account was at times overdrawn and that he did not want to take money from his business to invest in real estate, but thought if necessary that he could raise his part of the purchase money.

The defendant then stated that he thought that he would have some spare money later, the proceeds of a sale of a farm he was then negotiating but was not certain that it would go through, but if it did he would lend them the money with which to buy the land. He added, however, that if he furnished them the money with which to pay for their portions, they would have to give him satisfactory security outside of the land, as he would not take a mortgage back on the property for the money. They then requested him to accept a deed of trust on the property to secure the loan, and have him make partial releases of the deed of trust, as the lots were sold. He declined that proposition also.

The matter of the loan was then dropped until the price at which the land could be bought could be ascertained, which they then understood was being held at $5000.

In the meantime Chapin had stated that the firm of Brown, Harding & Brown, represented the owners of the land, and it was agreed that the defendant should call upon them and ascertain the least price at which they could purchase the land. This he did, and was told by the senior Brown, that a good title to the property could not be furnished for the reason that one of the owners was a minor, and a resident of one of the western States. The defendant then stated to him that it would be useless to consider the matter further, if a good title could not be furnished. On the following day defendant saw Chapin, and told him what Mr. Brown had said about the minor, and the inability to furnish a good title.

The next day defendant went to Farrar's office and also told him what Brown had said, and told him that even if the property could have been bought with a clear title, he would not have taken Chapin in as a partner, as he did not consider him financially responsible and would not make him a loan. He told Farrar, however, that if the land could be purchased at any future time, he would be willing to take him in as a partner, and lend him the money with which to pay for the land, provided he would secure him outside of this property, but neither of which offers did Farrar accept, but said that if Chapin could not be let in on the deal, he did not care to go in himself.

The defendant supposing that the deal had fallen through, had no further conversations with either of the plaintiffs regarding the purchase or the loan of the money.

On June 21, 1905, defendant went to the office of Brown, Harding & Brown, regarding some litigation they had for the Cherry-Tilden Live Stock Commis-

sion Company, and for the first time met Mr. Harding, who suggested to him that he had heard that he, Cherry, had made some inquiry about the Orton tract of land, and asked him if he did not want to make a bid for it; stating that he thought that a curator for the Oregon minor could be appointed in Missouri, and through him a deed conveying a good title could be made. Thereupon defendant made a conditional bid of $4500,.and paid $500 of the purchase price, with the understanding and agreement that if the offer was not accepted and the title could not be perfected in the manner suggested, the $500 was to be returned.

The proposition was submitted to the owners, who accepted it, and Mr. Harding procured the appointment of a curator for the Oregon minor, by the probate court of Jackson county, Missouri. Thereafter, to-wit, on January 3, 1906, the curator and the owners of the land executed deeds to Cherry, conveying to him the land in controversy.

No further conversations took place between plaintiffs and defendant regarding the land until May 18, 1906, when Farrar visited the office of defendant, in company with a stock yards detective. There Farrar asked defendant, "Wasn't the Orton heir of age yet?"

Defendant replied that all he knew was what Brown told him at his office as previously stated. Farrar then asked if a guardian could not be appointed in Oregon for the minor heir. Defendant replied that he did not know, as he was not a lawyer, and was not familiar with the Oregon law. He then asked defendant if it was not the understanding that he, Farrar, Chapin and defendant were to buy the property together. Defendant replied in the negative and told him that he had always refused to go in partnership with Chapin as he did not consider him financially responsible, and would not make him a loan. Farrar then asked defendant if he had not already purchased

the land, to which defendant replied that he had contracted for it the previous summer and had procured the deed on January 21, 1906.

The conversation then turned to the subject of improvements the defendant had put upon the premises, and finally Farrar wanted defendant to convey to him one-third of the land, which he refused to do, and thereupon this suit was instituted.

Upon the foregoing state of facts the circuit court found for the plaintiffs, and decreed that defendant held the legal title to an undivided two-thirds of the real estate for the use and benefit of respondents; that defendant had expended $5089.90 on account of the purchase and improvements of the land, including the payment of taxes; that he had received from the sale of wood from the premises the sum of ninety dollars, making a net balance expended by the defendant of $4997.90; that plaintiffs were indebted to the defendant in the sum of $3331.99, being two-thirds of the net sum expended by the defendant. It was thereupon decreed by the court that the defendant convey to the plaintiffs an undivided two-thirds of said land.

In due time and in proper form the defendant appealed the cause to this court.

This suit has for its object the establishment of an implied or constructive trust, in favor of the respondents, to an undivided two-thirds of a four-acre tract of land located in Kansas City, Missouri, the legal title to which is in the appellant.

In the absence of the purchase price having been paid by a party, before he is entitled to the establishment of such a trust against one holding the legal title to real estate, a confidential relation must be shown to have existed between them, before an implied trust will by the law be created. In other words, in the absence of the purchase price having been paid by the party seeking to establish an implied or constructive trust, such a trust will never arise except where the

relation between the parties is confidential, such as husband and wife, parent and child, guardian and ward, attorney and client, principal and agent or between partners.

In the case at bar, there is no pretense that any such confidential relation existed between the respondents upon the one hand and the appellant upon the other, without it arose out of the pretended partnership, which is claimed by respondents to have been entered into by them for the purpose of purchasing the property in controversy. Counsel for respondents, recognizing that fact, drafted their petition upon the sole theory that a partnership had been entered into by these parties for the purpose of purchasing this land, and that such relation existed between them at the time the appellant purchased it.

The primary question, therefore, presented for determination is, Did a partnership relation exist between them at the time the land was purchased by the appellant? If so, it must be because a partnership agreement between them must have been entered into prior to the date of said purchase. That is self-evident, and before there could have been such a contract, the minds of all the parties thereto must have agreed to the same thing, in the same sense and at the same time. This mutual assent of the parties must embrace all the propositions of the parties, and so long as any matter forming an element of the contract is left open, the contract is not complete, and therefore not binding upon any of the parties.

The foregoing statement of the law of partnership is announced by all of the authorities, here and elsewhere. [Green v. Cole, 103 Mo. 70; Sutter v. Raeder, 149 Mo. 297.]

And as held by this court in the case of Strange v. Crowley, 91 Mo. 287, before a contract is completed or binding upon the parties thereto, there must have

been a definite proposal made on the one hand, and an acceptance thereof on the other, and that such acceptance must have been unequivocal, unconditional and without variance between it and the proposal made.

If we apply the rules of law thus announced, to the facts of this case, it must stand unchallenged that no contract of any kind was ever entirely concluded between these parties; that is, the minds of all the parties never at any time during the negotiation for the purchase of the property met or agreed upon a single proposition proposed, much less upon all the matters which were to constitute the elements thereof. But concede for the sake of the argument, that there was a contract of some kind entered into between the parties regarding the purchase of this land, nevertheless, it does not contain the elements of a co-partnership, which is clearly distinguishable from all others.

A partnership contract as defined by Cyc., in vol. 30, page 349, and supported by all of the authorities is, "A contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business, and to divide the profits and bear the losses in certain proportions."

In considering this question, it should be borne in mind that the business or commerce the plaintiffs contend the partnership was to engage in was the purchase of a princely estate of four acres of unimproved real estate, located in Kansas City, worth on the market not more than $5000, and actually sold to the appellant for $4500. It is not contended by respondents that the partnership was formed for the purpose of engaging generally in the buying and selling of real estate, but simply to purchase that one tract. All of the parties were engaged in other callings, and there is no evidence whatever contained in this record which tends to show that any of them were contemplating

a change or desired to engage in another or additional business enterprise.  Moreover, if they had really desired to form a partnership for the purpose of purchasing this particular tract of land and selling it, they would doubtless have pursued the matter further and agreed upon the terms and conditions thereof, and what amount of capital each would contribute, what disposition was to be made of the property after being purchased, who should manage and control it and the amount of profits and losses each should bear, and the means by which the taxes and other incidental expenses attending the sale and disposition of the property should be paid, such as fees for platting the property and commissions for selling the lots and collecting the proceeds thereof.  The evidence fails to show that any of these things were agreed upon by all the parties, some of them were not even mentioned, and others only in general terms.

From the earliest days in this State, this court has been wedded to the doctrine that general remarks occurring in a conversation between two or more parties regarding a business proposition, are not sufficient evidence of a partnership agreement.  [Price v. Edwards, 11 Mo. 524.]

The terms, conditions and elements of the proposed co-partnership must be unequivocally and unconditionally agreed to by *all the parties thereto,* without any variance between the propositions or conditions proposed by any one of them and the acceptance by the others.  Or, as was held in the case of Mackie v. Mott, 146 Mo. 230, the foundation of a co-partnership is one of intention by *all the parties thereto,* which must be arrived at from the contract itself, and surrounding circumstances.

In Hazell v. Clark, 89 Mo. App. 78, l. c. 83, this language is used by the court: "The terms of the contract, where there is one, must fix the real status of the parties toward each other. . . . The intention

is to be ascertained from the whole of the contract—from the actual relations it creates—and not from the fact that the parties denominate it a partnership.''

Accepting the law to be as stated in the authorities before cited, let us view the evidence in the case, and see if it establishes a co-partnership between these parties, as defined therein.

According to Chapin's testimony, no agreement whatever was made as to the manner or time in which the property in question was to be paid for. He is positive in his testimony that Cherry was not to pay for his (Chapin's) interest in the land; that he was to furnish the money himself with which he was to pay for his interest therein, and was not to borrow it from Cherry and give a deed of trust on his interest therein to secure its payment, as testified to by Farrar, and in part by Cherry; that is, Cherry testified that both Chapin and Farrar, and especially the former, proposed to borrow from him the money with which to pay for his interest in the land, and to give him a deed of trust on his interest therein, to secure the payment of the money loaned, with the right to sell lots and apply the proceeds thereof to the payment of the deed of trust, and for Cherry to release each lot from the deed of trust as sold, which Cherry declined to agree to.

Chapin went so far in his testimony as to state that the deal had not progressed far enough to consider the question as to where the purchase money was to come from.

Cherry not only declined to lend the money to Chapin, taking a deed of trust on his interest in the land as security for its payment, but he also assigned his reasons for such declination, which are strong, sensible, and convincing to our minds that he never agreed thereto, and for that matter the minds of all of them never met on that proposition.

If Cherry was not to furnish Chapin the money with which he was to pay for his interest in the land,

then it is practically conceded that he could not have
gone into the proposition for want of the necessary
means. It is true he testified that he himself intended
to furnish the money with which to pay for his inter-
est, and had a piece of property upon which he could
have realized a sufficient sum for that purpose, but
when we read the testimony of Cherry, Farrar and
the other evidence in the case, it is almost conclusively
shown that he was relying upon Cherry to furnish him
the necessary money for that purpose, and to secure
the same by a deed of trust on the land. Practically
all the evidence shows Cherry refused to furnish him
the money, and he testified that he refused to go into
the deal with him on any terms, for the reason given,
that he did not consider him financially responsible.
Farrar's testimony corroborates Cherry's in that re-
gard, for he testified that Cherry said to him that he
did not want to go in with Chapin, but would go in
with him, to which Farrar replied that if Chapin was
not to be let in on the deal he, Farrar, would have
nothing to do with it either; and there the matter was
dropped.

Farrar's understanding was at variance with both
those of Cherry and Chapin. When asked by the court
if anything was said about the time when they· could
double their money on the land (just previously he
had stated that they had some talk about the probable
profits they could realize out of the land if purchased,
etc.), he answered, "A. I think not. I said we had
decided to buy the land and pay $1500 down on it and
then plat it and sell it out in lots. Mr. Cherry said:
'Now, I tell you I just disposed of some property in
Illinois and I have some money that will be here in a
few days. The way for us to buy this land is for us
to buy it for cash and I would like to put the money
in here and you can pay your part,' or something to
that effect. I said: 'I can pay my part of it now. Mr.
Chapin has some property down near the Southwest

boulevard on which he can realize enough to pay his part, but if you want to furnish the money we will pay you interest on our part and we will go ahead and buy this land.' He says, 'All right.' "

If this evidence is true, then all three of the parties had at some earlier time agreed to purchase the land, and pay down $1500, plat the ground, sell the lots and pay the balance out of the proceeds of the sales of the lots. Farrar is the only witness who testified to any such agreement.

Chapin testified that he was to furnish his own money with which to pay for his interest, that is, that was what he had in mind, but testified that the *deal had not progressed far enough to cause them to make arrangement for or to discuss the question of the money with which to pay for the land;* and Cherry testified that Chapin wanted to borrow from him sufficient money with which to pay for all of his interest in the land, and to give him, Cherry, a deed of trust on his interest to secure the loan, plat the ground, sell the lots and pay the debt secured by the deed of trust out of the proceeds of the sales of the lots, and that he declined to lend Chapin the money on those terms. Chapin testified he made no such proposal to Cherry, but that he was to furnish his own money with which to pay for his interest in the land, as before stated.

According to this testimony, the contract before mentioned to purchase the land on the partial payment plan, was changed at the suggestion and at the request of Cherry, who, Farrar testified, proposed to furnish all of the purchase money, he to pay his own part and lend to him, Farrar, and Chapin, respectively, their parts. This proposition Farrar said was accepted by him and Chapin, but Chapin says it was neither made nor accepted by them.

By reading that testimony, if true, it will be seen that Cherry never demanded or was to receive any security for the loan, nor agreed with them as to the

duration of the loan, nor for the rate of interest it was to bear.

Continuing, Farrar testified: "Q. Did you tell him, Cherry, how you would secure him for your part? A. No, he just said, 'I will furnish all the money and you folks can pay interest on your part.' Q. You hadn't come to the point in the agreement yet, where you were to furnish any security? A. No. I told him that Mr. Chapin had property that he could put up and make good his part, and I could fix mine, either pay it or make satisfactory arrangements, but did not state what they would be." Previous to giving this testimony, Farrar testified that the property of Chapin referred to, was located on West Madison street, and consisted of three lots with a house on one; all were worth about $3000, and that there was a mortgage for $1200, against the one with the house on it, "and something against one of the lots," and "I believe one was clear, a thirty-foot lot."

When we consider this testimony with all the other testimony of Farrar and Chapin, and view it in the light of the other evidence in the case, it shows conclusively that no partnership agreement had ever been entered into between the parties; that there was no meeting of the minds of all the parties upon scarcely a single proposition presented or discussed by them regarding the purchase of this land.

It is one of the most essential elements of a co-partnership, to know who is going to furnish the capital with which the partnership business is to be transacted, as well as the financial and business standing of each of the parties thereto. Each is an agent for all the other partners and if one has no capital invested, or has no business standing in the community, he might be a detriment instead of a benefit to the partnership. He could make unwise contracts in the name of the partnership and bankrupt it and its members, without jeopardizing his own interest.

These are some of the reasons why the law permits every person to select his own partners and never presumes the existence of a co-partnership, but requires those who assert its existence, especially as between themselves, to prove its existence, by the clearest and most positive evidence. The evidence in this case falls far short of that requirement. At best it shows that the appellant and respondents were simply consulting among themselves about purchasing the property in controversy as tenants in common, and no thought of forming a partnership for that purpose ever entered their minds.

When the agents for the land informed Cherry that a good title to the land could not be made on account of the minor child's interest therein, and that fact was communicated to Chapin and Farrar, they according to their own testimony, considered the deal off, at least until the minor became of age; and according to Cherry's testimony the proposition was totally abandoned, for the reason he stated, that he refused to go in with Chapin, and asked Farrar if he would go in with him alone. Farrar replied in the negative and added that if Chapin could not get in on the deal, he would have nothing to do with it himself. Then it was that Cherry alone took the matter up with Harding and purchased the land, as previously stated.

We are, therefore, of the opinion that the judgment should be reversed, and the cause remanded with directions to the circuit court to dismiss the bill. It is so ordered. All concur.