T. J. WILLOUGHBY, J. T. PRIGMORE and J. W. McWILLIAMS, Respondents, v. FRANK HILDRETH et al., Appellants.

Springfield Court of Appeals, June 16, 1914.

1. **APPEAL AND ERROR: Trial Court's Finding: No Interference With if Substantial Evidence to Support.** Where jury was waived and no declarations of law were asked or given, a finding of the trial court will not be disturbed by the appellate court if there is any substantial evidence to support it.

2. **PARTNERSHIP: By Estoppel: Review of Evidence in Case.** Action on account seeking to hold certain members of a "Farmers' Cooperative League" liable as partners. Evidence examined and reviewed and *held* insufficient to establish a partnership by estoppel.

3. **PARTNERSHIP: Contract: Definition of Partnership Contract.** A partnership contract is a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profits and bear the losses in certain proportions.

4. ————: **Question of Intention: No Fixed Standard for Determining.** The existence of a partnership is a question of intention and each case must be determined on its own facts.

5. ————: **Sharing Profits: Essential Element of Partnership.** An agreement to share profits is an essential element in every partnership and the absence of profit sharing is conclusive that a partnership does not exist.

6. ———: Sharing Profits: Prima-facie Evidence of Partnership. Participation in the profits of a business raises the presumption of the existence of a partnership and is *prima-facie* evidence thereof.

7. UNINCORPORATED ASSOCIATIONS: Whether a Partnership or Not: Constitution Must be Looked to. To ascertain whether or not a voluntary unincorporated association is in reality a partnership, the constitution of such association must be looked to, as that is the contract of the members.

8. ———: Constitution of: Examined: Partnership Not Shown. Constitution of a "Farmers' Cooperative League," a voluntary unincorporated association, examined and *held* not to show that the formation of a partnership was contemplated thereby.

9. PARTNERSHIP: Proof of: When Declarations and Acts of Alleged Partner Admissible. Until a *prima-facie* case is made out that a partnership exists, the fact whether or not it really exists cannot be proven by the acts and declarations of an alleged partner. Such admissions are allowed only as corroborative evidence.

10. ———: Community of Interests: Joint Ownership. Mere community of interest does not evidence a partnership in joint ownership of personal property.

Appeal from Jasper County Circuit Court. Division Number One.—*Hon. Joseph D. Perkins,* Judge.

REVERSED.

*H. L. Shannon* for appellants.

(1) A partnership is a contract of two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss in certain proportions. Cyc. Vol. 30, page 349; Freeman v. Bloomfield, 43 Mo. 391; Rinel v. Hayes, 83 Mo. 201; Maclay v. Freeman, 48 Mo. 234; Kellogg News Paper Co. v. Farrell, 88 Mo. 594; Mining Co. v. Swope, 204 Mo. 48; Thompson v. Holden, 117 Mo. 118; Sain v. Rooney, 125 Mo. App. 176; Gille Hardware & Iron Co. v. McCleverty, 89 Mo. App. 154; Bank of Osceola

v. Outhwaite, 50 Mo. App. 124; Herbert v. Callahan & Baker, 35 Mo. App. 498; Kelley v. Gaines, 24 Mo. App. 506; Donnell v. Harshe, 67 Mo. 170; Musser v. Brink, 68 Mo. 242; Ellis v. Brand, 158 S. W. 705. (2) As the defendants did not hold themselves out as partners in the Carthage Cash Store, and the plaintiff was not influenced by any such consideration in making the sale of their goods to said store, it follows that there could be no recovery unless they were partners in fact in said store. Gille Hardware & Iron Co. v. McCleverty, 89 Mo. App. 1. c. 159; Bank v. Osceola v. Outhwaite, 50 Mo. App. 124; Herbert v. Callahan & Baker, 35 Mo. App. 498. (3) Where a party assumes without authority to act as an agent, he warrants his authority as agent, and is liable for a breach of warranty. Cyc., Vol. 31, page 1545. A party cannot sue on one cause of action and recover on an entirely different cause of action. Beck v. Ferrara, 19 Mo. 30; Clark v. Clark, 59 Mo. App. 532; Wesby et al. v. Bowers, 58 Mo. App. 419; Cape Girardeau v. Kimmel, 58 Mo. 83; Reed v. Bott, 100 Mo. 62; Price v. Railroad, 72 Mo. 414; Harris v. Railroad, 37 Mo. 307; Clements v. Yates, 69 Mo. 623; Raming v. Metropolitan St. R. Co., 157 Mo. 507.

*H. L. Bright* for respondents.

(1) The defendants were members in good standing in the Farmers' Cooperative League at the time the Carthage Cash store became indebted to plaintiffs. They helped to start the Carthage Cash store. The store did a Commercial business and sold goods at a profit. Reports were made by its managers to defendants. When the store failed, defendants sold it and paid some of its debts. Defendants acknowledged in writing that they owned the store and owed the account of plaintiffs. The Farmers Cooperative League in its operation of the store was a partnership and

each member of the League is liable as a partner.  25 American and Eng. Ency. of Law, pp. 1131, 1133, 1136, 1139; Davidson v. Holden, 55 Conn. 103, 3 Am. St. Rep. 40; Kuhl v. Myer, 35 Mo. App. 206; Hammerstein v. Parsons, 38 Mo. App. 332; O'Rourke v. Kelly, 156 Mo. App. 91.   (2)  In an action at law like this tried by the court without a jury where no declarations of law were asked or given and there was simply a general finding for the plaintiff and there is substantial evidence in the record to support the judgment, the judgment will be affirmed, there being nothing for the appellate court to review.  Hanekrat v. Broughman, 164 Mo. App. 108; Bowser v. Atkinson, 161 Mo. App. 450; Wischmeyer v. Richardson, 153 Mo. 556; Scarrett Estate Co. v. Casualty Co., 166 Mo. App. 567; Rice v. M'Clure, 74 Mo. App. 383; Garrison v. Lyle, 38 Mo. App. 558; Rausch v. Michel, 192 Mo. 293; People's National Bank v. Central Trust Co., 179 Mo. 648; Rice v. McClure, 74 Mo. App. 383; Rausch v. Michel, 192 Mo. 293; Gaines v. Fender, 82 Mo. 497; Miller v. Brenke, 83 Mo. 165; Bond & Stock Co. v. Houck, 213 Mo. 416.

FARRINGTON, J.—Suit by three partners doing business under a firm name to recover for certain flour, feed and meal alleged to have been sold to sixteen residents of Jasper county on the theory that the defendants were partners in the Carthage Cash Store.  Plaintiffs were successful at the trial.  Defendants each denied the existence of a partnership among them under oath.  Because of dismissals and failure to join in the appeal, but four of the defendants remain in the contest to support the contention that there was no partnership existing among the defendants,—namely, Hildreth, Hill, Hoofnagle and Givler.  A jury was waived in the circuit court, and the trial proceeded.  No declarations of law were asked or given.  Hence, the finding in favor of plaintiffs will not be interfered

with if there is any substantial evidence of the existence of a partnership among the defendants. To make the issue plain, the defendants (appellants) contend, in effect, that the evidence was such that, if requested, the trial court would have been obliged to declare as a matter of law that no partnership existed among the defendants.

There is involved the sum of $64.60, and, to be sure, a principle. Indeed, this law suit is all that remains of the life and death of a collossal idea—a perfectly legitimate scheme that was put to work in Jasper county in the year 1909, which was designed to organize the farmers of the United States of America as a fraternal order, with all the proper dignitaries, a farm products sales agency and brokerage concern, and a purchasing agency which might operate a grain elevator, a storage warehouse or a cold storage plant. The name of the organization was "The Farmers' Cooperative League." There was no incorporation. There is no evidence as to how the organization was perfected, but the constitution of the order is in evidence, and it appears that one Whittaker was president and one Noble was "organizer" of the national league. The scheme contemplated a lodge of four grand divisions—national, state, county, and local, each having a full quota of officers. There might be many local lodges in a county, each having a president, vice-president, secretary, treasurer, inside watchman, outside watchman, chaplain, and an executive board of three members elected annually; and the representatives of the combined local lodges in a county constituted the county league, having similar elective officers, and an executive board, and a "county business manager." Noble filled the last-mentioned office at the time the Carthage Cash Store was started. Only two local lodges are referred to in the evidence, and if there were others they are not mentioned. There is no way of knowing from the record whether a state

league was ever organized, or whether the so-called national league ever set foot out of Jasper county. The constitution provided that it should be the duty of the county league immediately after its organization "to take such steps as may be necessary to establish at the most convenient and available point in the county, a storage warehouse, grain elevator, cold storage plant, or such other buildings as may be, in their judgment necessary for the successful and economical handling of such products of the farm and general merchandise as the circumstances and general surroundings will justify." Accordingly, a warehouse was established in a part of a building occupied by a firm conducting a general store, which was put in charge of the "county business manager" who received orders from the local lodges in the county and bought for cash from this general store in jobbing quantities at wholesale prices the goods ordered. Practically all the witnesses say that Noble was the first county business manager. This warehouse was continued for several months. In February, 1910, however, the Carthage Cash Store opened for business in another building and the warehouse was discontinued.

Now the evidence shows without dispute that money was advanced by certain members of the "Pearl Hill" and "Pleasant Grove" local lodges for the purpose of starting the Carthage Cash Store. There is some evidence that the matter of establishing the *warehouse* was discussed to some extent at the meeting of the county lodge, but no action seems to have been taken with reference to the establishment of the Carthage Cash Store. The defendants testified that the money was merely loaned by individual members and that they expected to get it back. Noble, who received and invested it, so testified. He also testified that a note was given for part of the money so advanced; that he put no money in the venture; that there was no agreement that any member of the or-

ganization should have any certain interest in the stock that he knew of; that the stock was not divided into shares; that he was under the direction of the executive board of the league; that when he was ready to turn the store over to some one else he consulted the executive board; that the board employed Downs; that the store was run for the benefit of the Farmers' Co-operative League; that the board audited his accounts; that his salary as business agent of the league was thirty dollars per month which was paid to him by the county secretary; and that they sold to members cheaper than to others, and also handled their produce to the best advantage.

The testimony of Williams (one of the defendants, originally) is that the note referred to by Noble was made payable to the "Pearl Hill" local, and that most of the members of that lodge put up money. Moss, a member of that local, and a defendant originally, didn't know whether the money was raised at a meeting night or not; he testified that the money he loaned to Noble was loaned when the note was given, that the different amounts were subscribed at different times, and that it was the money of individual members. Hoofnagle, an appellant, another member of that local, said he loaned some money and sent Moss to town with it, and thought he would get it back. Noble testified that appellants Hoofnagle and Givler were among those who advanced the money, and appellant Hill admits in his testimony that he loaned part of it. Appellant Hildreth, a member of the "Pleasant Grove" local, said that as an individual he never invested any money in the store.

There is evidence that at first the members of the league bought their goods for less than was charged nonmembers who patronized the Carthage Cash Store. Defendants said that later on this practice was discontinued and that members paid the same as nonmembers. Plaintiffs' witness Downs, who had charge

of the Carthage Cash Store for a while, testified that
Noble employed him, and that he knew nothing about
the other parties; that the store aimed to make a
profit on the goods sold to those who were not members
of the league; that when he quit, he turned the
store over to one Pritshau and to Noble in the presence
of a committee composed of three men of whom
Hoofnagle was one, and that this committee asked
Pritshau if he was satisfied he was getting what the
invoice stated, to which Pritshau replied that he was,
and that the committee then said: "So that relieves
you, Downs, and holds you, Pritshau."

Appellant Hildreth, secretary of the "Pleasant
Grove" local, and secretary of the county league, testified
that Noble "simply ran the whole league;" that
Noble made two reports to the county league as to his
management of the Carthage Cash Store, and that he
(the witness) was present most of the time and thought
appellants Hill, Hoofnagle and Givler were also; that
this report was supposed to be a general report of
the business, that went through his hands as manager
of that store. He testified that "the store was started
by Noble and run for the league;" that it was never
said in his presence that any member would ever derive
any benefit from the store or own any interest
in it; that "they first started at Wells & Wiggins store.
The firm presently moved over to the Carthage Cash
Store on Grant." He testified that Hoofnagle was a
member of the executive board of the county league;
that he did not know of his own knowledge who owned
the store.

Wells, who conducted the store where the first
*warehouse* was maintained, and who was not a member,
testified that during that time committees were
calling frequently with reference to the business and
that among them were appellants Hill, Hoofnagle and
Givler; that after the Carthage Cash Store had been
running for some time, it run behind in payments for

goods purchased of witness on credit and that a committee of three men (Hoofnagle, Dodson and Boggs) purporting to represent the farmers' league came and guaranteed the account to the amount of $175; "that is, they authorized us to sell up to the amount of $175 and they would stand back of it;" that when the store collapsed, it was owing them more than $175 and that Boggs and Hoofnagle came in and paid their one-third each. Appellant Hill testified, as to this notification, that the county league informed him as chairman of the executive board to notify Wells not to sell above a certain amount to the Carthage Cash Store. Hill was vice-president and then president of the county league. He testified that Noble made a written report which was approved by the county league. As to the money advanced, he was asked: "You were to get it back, if the store made good? A. Yes, sir; we were to get it back if the store came out all right." Again: "Did the store make a profit?" "A. I do not know that they did. We were to pay dues to keep up the business and pay the trade agent." He testified that the county league elected a committee to investigate the running of the store; that after Noble turned over the store to Downs, the former made no more reports relative to the store, and that Downs run it, taking his salary out of the store. Further: "I never gave him (the business manager) authority to buy goods on credit. He started out on a cash basis to do business strictly for cash. That was the way we started. We put up money to that effect."

It may be stated at this place that there is no evidence of any activity of the league other than in the running of the warehouse and then taking such an interest in the Carthage Cash Store as the evidence hereinbefore detailed tends to prove.

It is clearly shown that appellants Hill, Hildreth, Hoofnagle and Givler took charge of the store at the end and sold the goods on hand and applied the pro-

ceeds toward the payment of the debts. Hill testi-
fied that he was chairman of the executive committee
of the county league at the time the store was closed,
and that the money in the county league's treasury
was upon action duly taken applied on the debts of
the store. Further: "Some of us after he wound up
the store made an effort to get the members of the
organization to come in and pay their part of the debt.
Each member pay a couple of dollars, and pay the
debt. We thought that would be the way to pay the
debt. No, we could not get the members to do that.
Some of them did not think that the right way to do.
Some did. We just had to let it come before the higher
authorities." And defendants Hill, Hildreth, and Giv-
ler, were plaintiffs' witnesses at the trial. Defendants
testified that they took charge of the store simply be-
cause it was turned over to them and not because they
had any interest in it.

Hildreth wrote this letter to plaintiffs' attorney
on October 21, 1911: "Yours of the 19th received last
night. There are something like 150 of us that com-
posed the 'Farmers' League.' The cash store belonged
to the League we sold to the present owner. S. P.
Hill was president. We are settling the accts. as fast
as we can. This is our busy time. Now we are going
to call a meeting within ten days if you wait a few
days it will not be necessary to sue on the acct."

On October 31, 1911, Hill wrote this letter to plain-
tiffs' attorney: "Yours of the 28 at hand. Will say
we have a meeting next Saturday in Carthage and will
come and see you we have some money on hand. I
think enough to settle your account."

On November 28, 1911, Hildreth wrote this letter
to one of the plaintiffs: "In order to facilitate set-
tling the accts of the Carthage Cash Store we would
like to have the Reeds Milling Co's (plaintiffs') acct
placed in the hands of H. L. Bright for collection,
yours, Wells-Woodard, and Lamar Broom Co. are the

three largest that are not settled. There are a hundred and fifty 150 members men scattered over the county, we cannot get them together or get anything out of them, ourselves, so we have decided to let you fellows start suit against the whole league. We furnish Bright the names when they find they are in for a law suit we think they will show up and pay the assessment. Without going into court. I can't see any other way to get at it can you?" As to this letter, Hildreth was asked: "You knew at that time, did you not, that you owned that store? A. Just as I told you before, I don't know positively. I supposed we did."

The foregoing is indeed a brief summary of the evidence adduced at the trial.

Plaintiffs were compelled to make their case by putting certain of the defendants on the witness stand.

The evidence fails entirely to establish a partnership by estoppel. (See Ellis v. Brand (Mo. App.), 158 S. W. 705, 706; Konta v. Stock Exchange, 189 Mo. l. c. 38, 39, 87 S. W. 969.) There is no evidence that defendants held themselves out to plaintiffs as being partners or that plaintiffs supposed they were partners. The record is blank as to this. The only one of the three plaintiffs who testified stated that he solicited trade from two different managers of the Carthage Cash Store, and that he had no conversation with any of the defendants with reference to this matter prior to the time the goods were sold.

Our Supreme Court in Chapin v. Cherry, 243 Mo. l. c. 402, 147 S. W. 1084, approves the following definition of a partnership contract given in 30 Cyc. 349 "A contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business, and to divide the profits and bear the losses in certain proportions."

The existence of a partnership is a question of intention and each case must be determined on its own facts. [McDonald v. Matney, 82 Mo. 358; Torbert v. Jeffrey, 161 Mo. 645, 61 S. W. 823; A. Graf Distilling Co. v. Wilson, 172 Mo. App. 612, 619, 156 S. W. 23; Ellis v. Brand, supra, l. c. 708.] "If there be no specific contract of partnership between the parties, a court will look to the entire transaction and from that construed in the light of surrounding circumstances, determine what was the intention of the parties, and this intention will be the controlling factor in determining whether or not a partnership existed." [Beller v. Murphy, 139 Mo. App. l. c. 668, 123 S. W. 1029; Diamond Creek C. G. & S. M. Co. v. Swope, 204 Mo. l. c. 58, 102 S. W. 561.] "An agreement to share profits is an essential element in every partnership and the absence of profit sharing is conclusive that a partnership does not exist." [Sawyer v. Burris, 141 Mo. App. l. c. 117, 121 S. W. 321.] Hence it is held that participation in the profits of a business raises a presumption of the existence of a partnership. [Torbert v. Jeffrey, 161 Mo. 645, 61 S. W. 823.] It is prima-facie evidence of partnership. [Goddard-Peck Grocer Co. v. Berry, 58 Mo. App. 665; Philips v. Samuel, 76 Mo. 657.] But this is not saying that the law ever presumes the existence of a partnership. [See Chapin v. Cherry, 243 Mo. 376, 147 S. W. 1084.] "If it is obvious as between the parties, that no partnership was intended, then the partnership relation does not obtain between them, whatever arrangements they may have had for conducting the business." [Sawyer v. Burris, 141 Mo. App. l. c. 117, 121 S. W. 321.] In the case of A. Graf Distilling Co. v. Wilson, supra, l. c. 619, 620, the Missouri decisions are carefully reviewed, and attention is called to the fact that the following quotation from Story on Partnership (6 ed.), Sec. 49, was made in Kelly v. Gaines, 24 Mo. App. 506: "In short the true rule *ex aequo et bono,* would seem to be that

the agreement, and the intention of the parties them-
selves, should govern all cases. If they intended a
partnership in the capital stock, or in the profits, or
in both, then that the same rule should apply in favor
of third persons, even if the agreement were unknown
to them. And, on the other hand, if no such partner-
ship were intended between the parties, then that there
should be none as to third persons, unless where the
parties had held themselves out as partners to the
public, or their conduct operated as a fraud or deceit
upon third persons . . .''

There was no attempt to hold the league, but only
certain members thereof. The league was a voluntary
unincorporated association. Its constitution must be
looked to in order to ascertain the relationship between
members, as that is the contract. [Konta v. Stock Ex-
change, 189 Mo. l. c. 38, 87 S. W. 969; Hammerstein v.
Parsons, 38 Mo. App. l. c. 336.] Such an association
may be a partnership, but such relation depends upon
agreement between the members. [O'Rourke v. Kelly,
156 Mo. App. 91, 135 S. W. 1011.] We find nothing
whatever in the constitution of the Farmers' Cooper-
ative League that contemplates the formation of a part-
nership. The evidence shows that no action was taken
by the league concerning the starting of the Carthage
Cash Store.

All that is shown here, giving plaintiffs' evidence
the widest possible range, is that some of the original
defendants and three of the four appellants loaned or
furnished money to Noble to start the store; that com-
mittees from the county league at times appeared at
the store and did things which, had plaintiffs been
present or known of might have established a partner-
ship by estoppel; and that at the collapse of the store
the four appellants purporting to represent the league
sold the stock of goods on hand and applied the pro-
ceeds to the payment of the store debts, and succeeded
in getting for this purpose what money there was left

in the treasury of the then dying county league, and made certain statements in letters that might tend to fasten liability upon the league. Until a prima-facie case is made out that a partnership exists, the fact whether a partnership exists cannot be proved by acts and declarations of an alleged partner, being admissible at that time as corroborative evidence. [Oil Well Supply Co. v. Metcalf, 174 Mo. App. l. c. 560, 160 S. W. 897.] There is absolutely no evidence of an agreement among members of the league, or among those who advanced money to start the store, to share profits, and this, under the holding in Sawyer v. Burris, 141 Mo. App. l. c. 117, 121 S. W. 321—that an agreement to share profits is an essential element of every partnership and that the absence of profit sharing is conclusive that a partnership does not exist—blasts the theory of the plaintiffs in this case. In joint ownership of personal property, community of interest does not necessarily evidence a partnership. Indeed, when such community of interest is held by members of a social or fraternal organization, the presumption is against the existence of a partnership. [30 Cyc. 368, 369.] There being no substantial evidence of the existence of a partnership in fact among the defendants, the appellate court will not make a contract for the parties, and the judgment is accordingly reversed.

*Robertson, P. J.,* and *Sturgis, J.,* concur.