W. R. ALLISON, Plaintiff-Appellant,

v.

Ivan E. DILSAVER, Defendant-Respondent.

No. 8283.

Springfield Court of Appeals.

Missouri.

Feb. 3, 1965.

Arkley W. Frieze, Frieze & Crandall, Carthage, for plaintiff-appellant.

J. Carrol Combs, Combs & Combs, Lamar, for defendant-respondent.

HOGAN, Judge.

This is an appeal by the plaintiff from a judgment and decree in favor of the defendant, Ivan Dilsaver, in an action, primarily for an accounting and for contribution, involving an alleged partnership or joint venture of the parties in buying, feeding and selling livestock during the years 1952, 1953 and 1954. A referee has heard evidence adduced in support and in refutation of the charges and credits claimed by the respective parties, and his conclusions resolve ultimately into a finding upon accounting for the defendant and against the plaintiff in the sum of $1,202.50.

The partnership, joint venture, or business undertaking involved here is now defunct, at a considerable net loss. The plaintiff brought this action originally as an action at law, seeking a money judgment against the defendant as co-maker of a promissory note upon which plaintiff had

paid a balance remaining due when the venture was finally wound up. The pleadings were later amended and numerous issues were raised by the amended pleadings; voluminous proof, including many exhibits, was presented. The trial of the case, if we count the filing of various motions and other formal matters, extended over a period of nearly eight years. As the case eventually developed, however, three principal issues were litigated and remain in controversy here: First, whether there was in fact a partnership or joint venture between the two parties, as those relationships are commonly understood; second, whether the defendant, as co-maker of several promissory notes executed to obtain money for the business, can be compelled to contribute toward the loss sustained and paid by the plaintiff; and finally, whether the plaintiff was properly charged with certain advances made by the defendant which have not been and cannot be repaid with common funds. With these points of controversy in mind, the facts may be generally stated.

Sometime in 1952, apparently during November, the plaintiff and defendant entered into an oral agreement to buy, feed and sell livestock. At the time, the plaintiff was engaged "in the funeral business" in Greenfield, Missouri, and the defendant lived with his wife and family on a nearby farm. The agreement between the two parties was oral and quite informal, and is one of the basic subjects of controversy between the parties. As the plaintiff recalled the agreement, "he [Mr. Dilsaver] come into my office down here at the funeral home and wanted to buy some cattle * * and we agreed fifty-fifty. * * * We agreed to borrow the money and buy these cattle. He would look after them and we would feed them and divide the profits, go 50-50 on them." Whether there were profits or losses, "it was a 50-50 deal." According to the defendant, the agreement was much more restricted; his position is that the plaintiff agreed to furnish all the money and he agreed to furnish his labor. The defendant testified that Mr. Allison

had come to the Dilsaver home and had, without encouragement on the part of defendant, broached the subject of feeding and raising cattle as a joint undertaking. When Mr. Dilsaver advised the plaintiff that he had no money to invest, and Mrs. Dilsaver protested that "we just wasn't financially able to swing a project of this size," Mr. Allison agreed that "he [plaintiff] would furnish the money, and I'd [defendant] put up the work, furnish the labor." The parties had agreed, Mr. Dilsaver said, that "the profits [would] be split between us if there [were] any profits," but the defendant never agreed to pay any losses incurred in the undertaking. At one point, Mr. Dilsaver was asked if anything was said about his paying any money that might be owed at the end of the venture, and he answered: "No. He said all I could lose was the labor I would put into it." The parties seem agreed that no writing was ever executed or signed and that their undertaking was for an indefinite period.

The parties did enter business dealing in livestock, particularly in cattle. That part of the association or venture which is material here began in the fall of 1952, and records produced by the appellant indicate that during the years 1952, 1953 and 1954 the parties acquired and sold cattle in substantial numbers. Their livestock was kept and fed at a number of places; some of the cattle, and apparently most of the calves produced, were kept and fed at the defendant's farm. Part of the herd was maintained at two other locations near Greenfield, and part was kept as far away as Fairland, Oklahoma, some 100 miles distant.

The parties borrowed extensively to finance and maintain their operation. The plaintiff relied heavily upon the banking transactions of the two parties as evidence of the existence of a partnership, and he introduced a number of promissory notes, liability ledgers and other banking records. Upon the basis of these memoranda, as amplified and explained by oral evidence, the plaintiff maintained that the parties had

in fact borrowed funds as general partners and had become jointly obligated on the notes which they made. The promissory notes introduced in evidence indicate that during the course of their operation, particularly in late 1952 and in 1953, the parties executed a number of promissory notes at the First National Bank of Golden City, Missouri, for sums ranging from $300.00 to $15,844.06, and others at another bank for sums totaling $7,330.68. Some of the notes were signed by both parties, some by the plaintiff alone, and some were simply signed "Allison and Dilsaver" by the plaintiff. The money which the parties borrowed was repaid from the proceeds of the business, except for the balance which the plaintiff paid. These promissory notes, in themselves, shed little light on the existence of a partnership or joint venture, save as they are explained and qualified by oral evidence, and the proof does not clearly distinguish those notes executed to obtain capital for investment and those executed simply to obtain money for operating expenses. A good many of the promissory notes bear unexplained notations, and some of them are marked simply "corn" or "feed" or "feed for cattle." Others bear no marking. There is one note, however, which was executed by both the plaintiff and defendant on October 29, 1953, to the First National Bank of Golden City, Missouri, for $15,844.06; it represented a consolidation and renewal of two other loans and was secured by a chattel mortgage on cattle and hogs. It is clear to us that it was on this note that a balance of $10,432.71 remained due when the venture was finally liquidated in 1954. This balance was paid by the plaintiff and, as we have indicated, the original and principal purpose of this action was to secure contribution of one-half of this sum from the defendant.

The parties' functions in the day-to-day operation of this venture or undertaking are not very fully developed. The plaintiff appears to have kept such records of the business as were kept, and although the parties maintained joint bank accounts at each of the banks with which they dealt, the plaintiff wrote all the checks and had control of these two accounts. Mr. Dilsaver testified that Mr. Allison "bought most of the feed" and that it was paid for "through the partnership account, this charge account." It is inferable from the record that when the cattle were moved from one location to another the plaintiff decided where they were to be moved, although the defendant testified that "once or twice" he went with the plaintiff to rent pasture. Mr. Allison's testimony, on the other hand, was that the management of the herd and the purchase of feed and renting of pasture was a matter which was attended to by "both of us, me part of it and both of us part of it."

The business records kept by Mr. Allison indicate that cattle were bought at a number of different places, from various individuals or concerns in southwest Missouri. The record is silent as to whether these purchases were made by the parties together or individually, and reflects no consultation between the parties concerning the grade or type of stock which was to be purchased. There is some indication that on one occasion Mr. Allison engaged in a separate and individual purchase and sale of feed, the proceeds of which he credited to one of the joint accounts; there is uncontradicted proof that some of the defendant's personal farming expenses were paid by Mr. Allison from the joint account, upon the defendant's agreement to repay the sums expended. Mr. Dilsaver proved without substantial contradiction that he contributed a considerable amount of feed, minerals and insecticide from stores or supplies which he had on hand or purchased individually, and the record indicates that some of the venture's feed was used by Mr. Dilsaver for individual purposes, that is, to feed to his own livestock.

When the defendant was asked who "made the decisions as to the sale of the cattle," he answered that it "was more or less talked out between us, but it was really up to him [plaintiff], the final decision. It was his money." However, on several oc-

casions, the defendant loaded and transported the cattle to market. Ordinarily, the proceeds of any sale of livestock were remitted directly to the plaintiff, but on one occasion, when hogs were sold, the defendant received his check directly. Mr. Dilsaver remitted this amount directly to one of the banks for credit on one of the notes secured by a chattel mortgage on livestock.

It does not seem to be seriously disputed that the defendant and his wife made a substantial contribution of labor in feeding and caring for the livestock. Mr. Dilsaver's testimony was that from "along in October or November" of 1952 until 1954, he fed and cared for the cattle and for the calves which were produced. He looked after the cattle on his own farm and made periodic trips to attend to those kept at two other locations near Greenfield; he "tried" to go to the location in Oklahoma at least once a month, although it was necessary to procure additional labor to look after the cattle in Oklahoma. He testified that he "looked after the sale" of the cattle. Mr. Dilsaver testified at some length to the expenditure of time, effort and labor otherwise involved on his part during the course of the venture, and while the plaintiff was of the opinion that Mr. Dilsaver had not furnished all the labor, as he had agreed, the referee has found as a fact that both the defendant and his wife contributed their labor and effort during the entire period involved. Other facts will be noted in the course of the opinion.

 The first point for discussion is whether there was in fact a partnership or joint venture between the parties. The referee concluded as a matter of law that no partnership was formed between the plaintiff and defendant, and consequently that there was no partnership to which to account. We consider such a conclusion to be wholly unrealistic. Indeed, both parties seem to assume in this court that there was either a partnership or joint venture be-

tween the plaintiff and defendant; both of them argue their points in such terms. The two types of associated enterprise are, to be sure, very similar. A partnership is defined by statute simply as "an association of two or more persons to carry on as co-owners a business for profit," Sect. 358.060 (1),[1] and judicially as a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profits and bear the loss in certain proportions. Van Hoose v. Smith, 355 Mo. 799, 803, 198 S.W.2d 23, 26 [2]. A joint venture is defined as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge. Scott v. Kempland, Mo., 264 S.W.2d 349, 354 [1]; Fish v. Fish, Mo.App., 307 S.W.2d 46, 49 [2, 3]. Of the two kinds of business association, it is generally recognized that the joint venture is the more informal, and that a contract for a joint venture may be implied without any showing of a specific or formal agreement. Fish v. Fish, supra, 307 S.W.2d at 50, and cases cited note 5. It has been noted that the two forms of enterprise have many common characteristics, and that they are governed by similar, if not identical, rules of law. Shafer v. Southwestern Bell Telephone Co., Mo., 295 S.W. 2d 109, 116 [13–15]. Where the participants in the association jointly purchase goods or other property in a particular instance for resale, with a view to dividing the profits arising from the transaction, as is the case here, it is admittedly difficult to distinguish between the two. Mechem, Elements of Partnership, Sect. 14, pp. 17–18 (2d ed., 1920).

 Without again reciting the evidence or detailing the inferences possible upon the state of fact presented, we consider it obvious that the plaintiff and defendant entered into a joint venture for the purpose of purchasing and reselling livestock, with the

*1.* All references to statutes and rules are to RSMo. (1959), V.A.M.S. and V.A.M.R., unless otherwise noted.

intention that each would share equally in the anticipated profits. The fact that their agreement was oral, informal, and in many respects quite indefinite in no way militates against such a conclusion. Fish v. Fish, supra, 307 S.W.2d at 51, and cases cited notes 13 and 14.

It does not follow, however, that such a determination rules the plaintiff's right to contribution, which is the primary matter he sought to have decided. Whether or not the defendant can be compelled to share in the net loss sustained by the business depends on the parties' agreement. Both types of associated enterprise, partnerships and joint ventures, rest on contract, State ex rel. McCrory v. Bland, 355 Mo. 706, 711–712, 197 S.W.2d 669, 672 [3, 4], 168 A.L.R. 929; Temm v. Temm, 354 Mo. 814, 823, 191 S.W.2d 629, 633 [14], and the rights and liabilities of the partners or coventurers inter sese, though they are generally fixed or implied by law, are subject to modification according to the agreement and intention of the parties, so far as that can be ascertained. Sect. 358.180; Hidden v. Edwards, 313 Mo. 642, 661, 285 S.W. 462, 467 [4]; 30 Am.Jur., Joint Adventures, Sect. 34, pp. 961–962. The trial court has impliedly found that the defendant is not liable to contribution. The appellant vigorously challenges that determination on this appeal. It is our duty to review the trial court's judgment upon both the law and the evidence, as in actions of an equitable nature, affirming the judgment unless it is clearly erroneous. If we find that it is, we are then to enter such judgment as may seem agreeable to law. Rule 73.01(d); Rule 83.13(c), V.A.M.R.; Hogan v. Krohn, Mo., 318 S.W.2d 163, 167 [1].

To rule the question of the defendant's liability, it is necessary to restate, at the expense of some repetition, the proof bearing on this aspect of the case. The plaintiff's position was that his agreement with the defendant created a general partnership. Mr. Allison was asked " * * *

what, if any, agreement in detail was entered into between you and the defendant in November of 1952," and he answered: "He come into my office down here at the funeral home and wanted to buy some cattle, he thought the time was right and we agreed fifty-fifty." His testimony then continued:

"Q. State if you will just in detail about what the substance of the agreement was. A. We agreed to borrow the money and buy these cattle. He would look after them and we would feed them and divide the profits, go 50-50 on them.

"Q. What agreement, if any, was there between you and the defendant about sharing any losses in the event there was a loss? A. It was a 50-50 deal.

"Q. Tell the Referee about that. A. *We agreed to divide the profits or losses 50-50.*"

The plaintiff's most direct evidence of the defendant's liability was, of course, his evidence concerning the parties' banking transactions. Our attention is directed and again recalled to one transaction in particular. When the plaintiff and defendant entered upon their joint venture (or at least the phase of it that is material here), they went to a bank to borrow money to purchase cattle. They executed one note for $2,500.00 and another for $14,310.06, the proceeds of which were used to buy cattle. Both notes were signed first by Mr. Dilsaver and then by Mr. Allison, without qualification. The larger note was secured by a chattel mortgage of cattle and "also all increase in above livestock during the life of this lien." These notes were made on November 24, 1952, and were due September 1, 1953. On October 29, 1953, these loans were consolidated and renewed for six months by the execution of a new note for $15,844.06, similarly signed and secured.

The parties made many other loans during the life of the venture; Mr. Allison introduced some sixteen promissory notes

(some of which were renewal notes) made, he said, to secure loans for the business. As these notes were explained and qualified by oral testimony, they indicate that between November 24, 1952, and June 18, 1954, the parties borrowed roughly $30,-000.00 from the two banks with which they dealt, and that, except for the balance of $10,432.71, all the money which they borrowed was repaid, with interest, from their joint bank accounts or directly from the proceeds of the business. As we have indicated, it is not at all clear what portion of this money could precisely be considered as capital invested and what part could be considered as having been procured to defray expenses, but it is clear that the balance due and owing when all was said and done, so to speak, represents a sum due on this first transaction, the proceeds of which, Mr. Allison said, were used to buy cattle. This balance due was paid personally by Mr. Allison on December 17, 1954.

Other evidence presented by the plaintiff tends strongly to show that the parties operated their business jointly and that they regarded it as a joint undertaking. Though Mr. Allison seems to have had control of their bank accounts, they were joint bank accounts, and the record indicates that for Federal tax purposes the parties regarded and represented themselves as partners. It is apparent that there was some consultation between the plaintiff and defendant before the sales of livestock were made and that the defendant arranged some of these sales; on one occasion, Mr. Dilsaver received his part of the proceeds of a sale directly. The parties' business was so informally operated, however, that, upon the record before us, we can ascertain little or nothing of their implied agreement from their conduct.

Contrasting his position as to the parties' agreement, the defendant said that the borrowing transactions were not contemplated by the original agreement; he testified in effect that there was originally no discussion concerning borrowing at the time he and

Mr. Allison agreed upon the undertaking in issue. He emphasizes that because of the disparity between his economic condition and that of the plaintiff, he was extremely reluctant to enter upon the cattle-buying transaction, and he testified that at the time he and the plaintiff began their undertaking, "I told him I didn't have any money to invest in such a project as that. I just moved down here from Nebraska and I had invested everything I had in machinery and livestock of my own and land." His original reluctance to enter into the venture was overcome only when Mr. Allison gave assurance that he would finance the venture. Mr. Dilsaver recalled the plaintiff's remarks as having been: "I'm putting up the money. I'm backing you. You won't have to worry about the money, I can get it."

On cross-examination, the defendant was asked:

"Q. What was the agreement as to the capital? A. Well he was to furnish the money. I was to do the work and all I was to be out was the labor. * * *

"Q. Was anything said about your paying any money that might be owed at the end of the arrangement? A. No. *He said all I could lose was the labor I would put into it.*" In short, the defendant's characterization of his agreement was that Mr. Allison was to contribute the money and he was to contribute the labor, and that he had been repeatedly assured that he would be expected to bear no losses personally if any were sustained. To a certain degree, Mr. Dilsaver was corroborated in this testimony by his wife and by a neighbor, who purportedly heard conversations between the parties at the Dilsaver farm. The defendant did not deny signing the three notes in question, but maintained that he had done so only because the lending officer had insisted that it was necessary in order to bind the joint venture or partnership to the terms of the chattel mortgage.

The gist of the plaintiff's argument is then that the defendant is liable to contribute half the balance due and owing when

the venture was finally closed out, because the loans were made as a partnership transaction; and as a joint venturer or co-partner, the defendant is bound by his agreement to share equally in the losses incurred by the venture. The defendant, on the other hand, insists that he and Allison had specifically agreed that the defendant was not to be personally bound to repay any losses, in the event the joint venture itself could not repay them, and that he is not therefore liable to contribute.

■ Various considerations may be set to one side. On the face of the transaction, the execution of the notes by the plaintiff and defendant doubtless created a joint obligation. 17 Mo.L.R. 176, 177; Mechem, op. cit., Sect. 308, pp. 272–273.[2] As a matter of general law, there may be some presumption that the co-makers of a promissory note, in the absence of any evidence to the contrary, are liable in equal amounts. 11 Am.Jur.2d, Bills and Notes, Sect. 588, p. 655. It must also be borne in mind that this action was not brought by the payee or a holder of the notes in due course. This was an equitable action for contribution, and we are of the view it was competent for the defendant to show by parol what his true obligation was. Frew v. Scoular, 101 Neb. 131, 162 N.W. 496, 498, L.R.A.1917F, 1065; 11 Am.Jur.2d, Bills and Notes, Sect. 588, pp. 655–656; 12 Am.Jur.2d, Bills and Notes, Sect. 1288, pp. 326–327. In any event, since no objection was made by the plaintiff to the defendant's parol explanation of his liability, the plaintiff could not now complain. Briegel v. Terry, Mo.App., 226 S.W. 624, 625 [1].

■ More directly to the point, while it is true that an agreement to carry on a joint venture ordinarily implies a duty to share in the losses, if any, incurred by the venture, Gales v. Weldon, Mo., 282 S.W.2d 522, 527 [3]; Fish v. Fish, supra, 307 S.W.2d 46, 49 [2], this does not compel the further inference that co-venturers are, at all events, under a duty to share all monetary losses equally. There is authority for the proposition that the loss-sharing agreement necessarily implied in a joint venture is satisfied if there is a monetary loss to one co-venturer and a loss of time or labor or property to the other.[3] And while there are divergent views concerning the proper apportionment of losses when one co-venturer or partner contributes only his skill or services as against the other's money contribution, and there is no controlling agreement on the subject, many authorities hold that in such a case neither co-venturer can have contribution from the other. Kovacik v. Reed, 49 Cal.2d 166, 315 P.2d 314, 316 [2]; Anno., L.R.A.1917E, 877. It is unnecessary to decide the case on the basis of any implied agreement, however, for certainly it is competent for the joint venturers to determine by agreement the basis upon which losses shall be borne as between themselves, and they may agree to limit or eliminate the liability of particular co-venturers to share losses. When this is done, it then becomes the agreement, and not some fixed rule of law, which determines the co-venturers' respective liabilities to each other.[4]

■ In the case at hand, the referee has found as a fact that the defendant was to lose only his labor, if there was a loss on

2. Though the applicable law may have since been modified by the amendment, in 1961, of former Sect. 358.150 by Laws of 1961, page 259, par. 1, now codified as Sect. 358.150, RSMo. (Supp.1963).

3. Martter v. Byers, 75 Cal.App.2d 375, 171 P.2d 101, 106 [5–7]; Shoemake v. Davis, 146 Kan. 909, 73 P.2d 1043, 1045; Summers v. Hoffman, 341 Mich. 686, 69 N.W.2d 198, 201–202 [3–5], 48 A.L.R. 2d 1033; 30 Am.Jur., Joint Adventures, Sect. 11, p. 947.

4. Harrington v. Sorelle, 10 Cir., 313 F.2d 10, 12 [1]; Albina Engine and Machine Works, Inc. v. Abel, 10 Cir., 305 F.2d 77, 82 [5]; Las Vegas Machine and Engineering Works v. Roemisch, 67 Nev. 1, 213 P.2d 319, 322–323 [4–7]; Summers v. Hoffman, supra, 69 N.W.2d at 201–202 [3–5]; 68 C.J.S. Partnership § 96, p. 537.

the venture, and we take this as an adjudication that the defendant was not liable to contribute toward payment of the $10,432.71. Upon the record presented, we cannot accurately assess the parties' intentions from their conduct, and thus ascertain the terms of any implied agreement which they may have had. There is not enough evidence of their respective duties and functions in the record for us to say whether their original understanding may have been modified by their subsequent course of dealing. We are remitted to their original oral contract to ascertain their liabilities as between themselves; and, while there is a straightforward conflict as to its terms, the resolution of this conflict was simply a matter for the trier of fact. We cannot say his finding was clearly erroneous.

■ The final point for our consideration is whether the trial court properly charged certain sums against the parties as individual charges and credits. The judgment appealed from takes into consideration the following items: 1. The sum of $1,936.80, representing materials and services furnished by the defendant. This amount was allowed as a charge against the plaintiff individually. This charge was offset by holding the defendant personally responsible for: 2. The sum of $188.20, representing payment for the defendant's own threshing and bulldozing paid from joint funds and not repaid by the defendant; 3. $495.00, representing feed furnished by the plaintiff but used by the defendant to feed his own calves; and 4. $51.10, representing labor furnished by the plaintiff. Other labor was apparently hired and paid for by the firm, but its value was not proved. By subtracting items 2, 3 and 4 from the first item, the trial court concluded that the plaintiff was indebted to the defendant in the sum of $1,202.50. The arithmetical calculations of the amounts involved are in fact supported by substantial evidence, and we therefore accept the amounts as calculated. Bass v. Daetwyler, Mo.App., 305 S.W.2d 339, 343 [6, 7]. What we review is the allocation of these items as charges against the individual co-venturers.

■ The plaintiff was held responsible for the sum of $1,936.80, representing a contribution of feed, medicine, insecticides, and labor and machine hire in the processing of ensilage. We conclude that this amount should not have been charged against the plaintiff individually, although we agree that ordinarily the furnishing of such materials would constitute an advance properly chargeable against the joint venture. Bradford v. Bradford, Tex.Civ.App., 172 S.W.2d 365, 367 [1–3]. The defendant's position throughout the case, however, was that he was required to make no money contribution of any sort to the joint venture. His testimony concerning Mr. Allison's obligation to repay these advances was that "nothing was ever said about it." While a partner or co-venturer may, in certain instances, properly charge the business itself with advances made for expenses, Bass v. Daetwyler, supra, 305 S.W.2d at 342–343 [4, 5], he does not, in the absence of an agreement, thereby become a creditor of the individual co-venturers. 68 C.J.S. Partnership § 81, p. 521. This amount was erroneously charged against the plaintiff.

■ On the other hand, we think the defendant is bound to repay the sum of $51.10, representing labor which he was obligated to furnish, and the sums of $188.20 and $495.00, representing the venture's money and feed, which he individually used. See 68 C.J.S. Partnership § 437e, p. 983. These amounts represent money contributions made by the plaintiff, the loss of which he has borne and which should be repaid to him. Further, since some of the substantial issues have been found for the plaintiff and some for the defendant, we consider it equitable to apportion the costs one-half to the plaintiff, and one-half to the defendant. See Bass v. Daetwyler, supra, 305 S.W.2d at 345 [16, 17].

The judgment of the trial court is therefore set aside and the cause is herewith re-

manded with directions to enter judgment for the plaintiff and against the defendant in the sum of $734.30, with interest thereon at the rate of six per cent per annum from June 7, 1963, when the judgment was rendered. Costs are to be taxed one-half to each party.

RUARK, P. J., and STONE, J., concur.