Nora E. GRISSUM, Respondent,

v.

Dale REESMAN, Administrator ad Litem of the Estate of Elwood Grissum, Deceased, Defendant,

and

State of Missouri, Appellant.

No. 57468.

Supreme Court of Missouri, Division No. 2.

Feb. 11, 1974.

Albert F. Hillix, Kent E. Whittaker, Kansas City, for Nora E. Grissum, respondent; Hillix, Brewer & Myers, Kansas City, of council.

John C. Danforth, Atty. Gen., Peter H. Ruger, Asst. Atty. Gen., Jefferson City, for appellant State of Missouri.

HENRY. I. EAGER, Special Commissioner.

This is an action in equity in which plaintiff seeks to have the Court declare sundry property, real and personal, as inventoried in her brother's estate, to be partnership property, with one-half owned by plaintiff. In a second and alternate count she sought to have a trust declared in one-half of the property for her benefit. Since the trial court entered judgment for plaintiff on the first count, it dismissed the second without prejudice, and we are not concerned with it here. The State of Missouri was made a party defendant, because the determination makes a substantial difference in the amount of inheritance taxes due, as well as federal estate taxes, and perhaps others. Decedent devised and bequeathed all his property by will to the plaintiff, so actually the only practical result here is a determination of the amount of taxes which she should pay. The difference in amounts seems to be conceded as approximately $57,000. Nora Grissum, as Executrix, was named as the original defendant, but an Administrator ad Litem was appointed and he appeared both in pleadings and at trial in defense of the action, in lieu of the Executrix. The State of Missouri appeared in pleadings and at trial, and it alone has appealed. We note here that the Statute of Frauds was pleaded by both defendants as a defense. It is unnecessary to digest the pleadings. They were sufficient to raise all the issues discussed. This Court has jurisdiction since the State is a party and the notice of appeal was filed prior to January 1, 1972.

Elwood Grissum died on March 5, 1970. The inventory of his estate, filed in the Probate Court of Cooper County, listed personal property of the value of $65,503.-80, and real estate of the value of $220,902; a notation was made that one-half of that property was claimed by Nora E. Grissum. A joint checking account of $17,990.31 and sundry certificates of deposit issued to Nora E. Grissum and Elwood Grissum, "either or the survivor," were also listed; such joint property aggregated approximately $80,000. The real estate consisted of farmland which plaintiff and her brother had occupied and farmed and the personal property was largely farm equipment, livestock and feed. The farm acreage was 1,104.51 acres, apparently in several tracts but located close together. The title to the real estate was in the name of Elwood Grissum.

The theory of plaintiff's case was and is that a partnership was created orally between her brother and herself, back in the 1930's to operate the farmland then owned or to be acquired, to accumulate property, and to share the benefits 50-50. Plaintiff was prevented from testifying by the effect of the Dead Man's Statute which, of course, imposed a severe handicap upon her. These two continued to farm the land together until Elwood's death in 1970.

There was ample evidence that Nora did the cooking, housework and all related chores, kept the books for the operation, did most of the banking, wrote all checks and paid all the bills, fed the livestock, sorted cattle and hogs and, at times, did actual, hard farm labor. This continued through all the years. She was regularly consulted about the purchase and sale of livestock and land; she frequently (or usually) accompanied her brother on trips for the purchase or sale of livestock, and such deals were made by agreement. The farm truck bore the legend: "Elwood & Nora Grissum Farms—Boonville Mo." Elwood had this placed on the truck. A sign was placed by Elwood over the harness shed bearing the legend,—"Elwood & Nora Grissum Boonville Mo." This was visible to anyone approaching the house from the highway. (This sign evidence was objected to. It will be discussed later.) Elwood Grissum told sundry people, over the years, both in the presence of Nora and out of her presence, that they were partners on a 50-50 basis. A nephew of Elwood, John Grissum, Jr., who worked with him a great deal over a period of many years, asked Elwood why they could not "go partners"; the reply was that Elwood could not do so because he already had a partner, his sister. This nephew was told at sundry times that the arrangement was a partnership; on more than one occasion he heard Nora ask Elwood when he was going to fix up the business so that she would be protected, and his answer was that they would go in and fix it up if they ever got time. In other conversations, Elwood stated on many occasions to other farmers, his doctor, and perhaps others that (in substance) he and his sister were partners in their farm enterprise "50–50", or "all the way through," or that they "owned the whole thing together," or were partners in everything. Some of these statements were made on various occasions to the same individuals. One was made so as to include the real estate. Nora, at times, made similar statements in her brother's presence. On one occasion

Elwood told his nephew that he thought Nora should "come up" with her partnership half of the work (apparently meaning farm labor), and the nephew replied that she was doing more than her half. Elwood and Nora discussed and decided together on livestock deals and the general operation of the farm. The statements relating to the partnership extended back at least as far as the 1940's and they continued to within a very few weeks of Elwood's death. Nora and Elwood told their banker that everything they had was a "joint venture." All entries into the safety deposit box, except one in 1949, were made by Nora. On one occasion Elwood stated that he would have to consult Nora before buying some cattle because she was his partner; he later bought them.

A joint bank account was opened in the names of Elwood and Nora Grissum in June, 1967, with a deposit of $13,128.68, proceeds of the farm operations. Prior to that time the account had been kept in the name of Elwood Grissum. The joint account was continued until Elwood's death with all farm money deposited in it. When money was borrowed Elwood signed the notes alone. The farm insurance was applied for and issued in both names, i. e., Elwood and Nora Grissum, from at least as early as 1957 and presumably before. It was stipulated that Elwood filed individual federal income tax returns (and presumably Missouri also) from "about" 1966 through 1969, and copies were produced as exhibits. We are not advised what was done before that. For the year 1970, four returns were filed: an individual return for Elwood to the time of his death, a partnership return, a fiduciary return, and an individual return for Nora. The point of all this is that Elwood did, for some years prior to his death, report farm income on individual returns. We shall discuss this later. The exhibits show that land was acquired in the name of Elwood in 1937 (presumably from his father and mother) in 1942, 1946, 1947, 1948, 1949 and 1952. He executed two deeds of trust which were soon paid and released. It is

obvious that most of these tracts were purchases made to increase the farming operation. The occupancy and operation of the farm or farms started in the depression in the 1930's, with (apparently) one eighty-acre tract; at Elwood's death the inventory value (exclusive of joint property) had increased to approximately $286,000. During all this period Nora had lived and worked on the farm. It is certainly true that both Elwood and Nora derived all their living expenses from the operation of the farm, for no other source of income is indicated. It also seems obvious that neither drew down any profits, as such, but that all excess went into the expansion of the farm operation and (some) beginning in January, 1969, into joint certificates of deposit. The defendants put on no witnesses.

The appellant relies here on the following points: (1) that the evidence did not sufficiently establish a partnership; (2) that the Court erred in admitting "evidence of a collateral nature," and (3) that the action is barred by the Statute of Frauds.

■ On the first point appellant cites many cases. It would be both confusing and useless to attempt to compare their facts with those in the present case. We have examined them and will try to express here the principles which they seem to enunciate. In general, it is thus held: that mere joint ownership of property, or "helping out" in the conduct of a store (by a wife) is not sufficient proof of a partnership (Shawneetown Feed and Seed Co. v. Ford et al., 468 S.W.2d 54 (Mo.App. 1971); that the supposed partners must have made a definite and specific agreement (Chapin v. Cherry, 243 Mo. 375, 147 S.W. 1084 (1912); that the intention of the parties is the primary criterion in deciding whether a partnership exists (Bussinger v. Ginnever, 213 S.W.2d 230 (Mo. App.1948); that a partnership may be established by oral agreement or it may be implied from the acts and conduct of the parties and from the circumstances (Bussinger, supra; Prasse v. Prasse, 77 S.W.2d

1001 (Mo.1934); that a participation in profits and losses is the usual and perhaps most cogent test of the intention of the parties, but this is not conclusive (Van Hoose v. Smith, 355 Mo. 799, 198 S.W.2d 23 (1946); that there may be a joint venture by an arrangement which is entirely informal, an agreement to share losses may be implied, and there may be an agreement that one party should only lose his labor (Allison v. Dilsaver, 387 S.W.2d 206 (Mo.App.1965); that a sharing of profits is necessary in a partnership and evidence of this raises a presumption that a partnership exists (Sawyer v. Burris, 141 Mo.App. 108, 121 S.W. 321 (1909); Willoughby v. Hildreth, 182 Mo.App. 80, 167 S.W. 639 (1914); that a sharing of profits is not conclusive of the existence of a partnership and there must be certain rights of management in each partner. (id.) Several of these cases are cited as holding that partnership can only be shown by "clear and convincing" evidence or by "cogent, clear and convincing" evidence or by evidence of substantially that character. However, at least one cited case refers to a "preponderance of the evidence," Bussinger v. Ginnever, 213 S.W. 2d 230 (Mo.App.1948), although stating also the "cogent, clear and convincing" rule. In Fish v. Fish, 307 S.W.2d 46 (Mo.App.1957) at l.c. 52 (Stone, J.), the burden referred to was "the preponderance of the credible evidence," and the same degree of proof was referred to in Brooks v. Brooks, 357 Mo. 343, 208 S.W.2d 279 (1948) and Scott v. Kempland, 264 S.W.2d 349 (Mo.1954); in fact, in Brooks the Court said that a preponderance of the evidence was necessary and sufficient to prove a joint venture (and we see no distinction in this respect between a joint venture and a partnership). In that case the Court noted that a higher degree of proof was not required because the suit did not involve an oral contract to convey real estate or the establishment of a resulting trust in real property. The term frequently used in equity cases, with reference to the required degree of proof, is "clear, co-

gent and convincing" evidence. The courts have seldom stopped to analyze that term. As we now construe the phrase, it really means that the court should be *clearly convinced* of the affirmative of the proposition to be proved. This does not mean that there may not be contrary evidence. The word "cogent" adds little, if anything; it means impelling, appealing to one's reason, or convincing. And in viewing the evidence we consider the background of the parties; they were not lawyers or accountants or businessmen, but plain country people.

◼ We shall add a few references to principles stated in the cases cited by the plaintiff. They are, generally, that: a partnership agreement may be implied from conduct and circumstances and there is no essential difference between a partnership and a joint venture. Neville v. D'Oench, 327 Mo. 34, 34 S.W.2d 491 (1930); Troy Grain & Fuel Co. v. Rolston, 227 S.W.2d 66 (Mo.App.1950); that evidence of a sharing of profits constitutes prima facie evidence of the existence of a partnership and in the absence of other evidence becomes conclusive, Troy, supra; that the parties are not required to know all of the legal incidents of a partnership, Troy, supra; and they are not held to such a standard, Schneider v. Schneider, 347 Mo. 102, 146 S.W.2d 584 (1941); that a partnership consists of a factual relationship between two or more persons who conduct a business enterprise together, Schneider, supra. We note further that when the essentials of such an agreement have been established, expressly or by implication, it is not to be avoided because of uncertainty or indefiniteness as to minor details and, in the absence of express agreement, it will be presumed that profits are to be shared equally. Fish v. Fish, 307 S.W.2d 46 (Mo.App.1957, Stone, J.,); Allison v. Dilsaver, 387 S.W.2d 206 (Mo. App.1965).

In Section 358.060(1) [1] a partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit"; in § 358.070(4) it is provided that with certain exceptions the receipt by one of a share of the profits of a business is prima facie evidence that he is a partner. Section 358.100 recognizes that partnership real estate may be held in the name of one of the partners.

◼ The trial court found generally for the plaintiff on the issue of partnership (Count I). It recognized that there was evidence to the contrary, but found evidence of ample and numerous admissions of the existence of a partnership and of acts performed by the plaintiff in furtherance thereof, with a reliance on Nora's part upon the partnership agreement. The Court also found that if it did not grant aid to the plaintiff she would suffer an equitable fraud based upon her reliance upon the existence of a partnership. We may defer to the findings of the trial court on matters affecting the credibility of witnesses; while this doctrine is usually applied in cases of conflicting oral testimony, it is equally applicable to the obvious belief of the trial court in the truth and credibility of witnesses who testified without contradiction. This means that we have here the trial court's belief of all those witnesses who testified to the many statements of the deceased to the effect that he and his sister were operating in a 50–50 partnership "all the way through." Allowing such deference, we make our own findings and conclusions. We shall not quibble here as to the degree of proof required of plaintiff; since real estate is involved, we recognize the "clear, cogent and convincing" rule and, using our construction of that test, we are *clearly convinced* that a partnership was intended and existed.

Over a period of 30 or so years Nora devoted her whole life to the operation and advancement of this farming operation;

---

Elwood told her and others on many occasions that they were partners, 50–50; we may fairly assume that she relied on these representations for her protection, for any will that her brother had made or might make in her favor could be changed; he had other relatives. The operation was held out to the community as a partnership, both by Elwood's many statements and by the signs which he placed upon the truck and farm building. Farm insurance was issued to both over a period of years. Nora was consulted on the business deals; Elwood refused to buy cattle without consulting her; she wrote all checks and kept all accounts. The element of profits and a sharing of profits is essential. It is important to note here that although the operation was prosperous, neither party ever drew down any profits, but put all money over and above farm expenses and living expenses into additional equipment and land, until in 1967 and 1969 when they established the joint account and bought the joint certificates of deposit. The joint account recognized Nora's interest in the farm operating funds, and the joint certificates recognized her interest and ownership in the accumulated funds. It would appear, therefore, that Nora shared in any and all profits just as much as Elwood did, but that neither saw fit to make use of them individually. It is a fair inference that either had the *right* to take profits at any reasonable time. It is probable that minor losses may have occurred over the years; if so, they were taken care of out of the general funds.

We recognize that three things speak to some extent in opposition to a partnership, namely: (1) the individual income tax returns filed by Elwood; (2) the fact that title to the real estate stood in his name; and (3) that an individual bank account in Elwood's name was maintained until 1967, although Nora drew checks upon it regularly in Elwood's name by herself. It is generally recognized (§ 358.100 and cases) that partnership property may be held in an individual name. That element is of no great materiality. When we consider the background of these individuals, the fact that they cannot be held to have known the usual or legal requirements or incidents of a partnership, and the fact that it was probably a matter of convenience to transact those certain phases of the partnership business in an individual name, we find that these things are not sufficient to prevent a conviction that a partnership in fact existed. Certainly Nora was not an employee, for she received no wages; she was not a wife, and it was not her duty as such to perform all such services and labor. We are *clearly convinced*, and hold, that a partnership existed with the ownership of the property and the profits to be shared on an equal basis.

The appellant says that the Court erred in admitting "evidence of a collateral nature." While objections were made at the trial to various statements attributed to Elwood confirming the existence of a partnership, the only question briefed here is the admission of photographs of the signs placed by Elwood on the farm truck and a farm building. The witness who identified the photographs testified that each sign was placed in its position by Elwood or at his direction. The evidence, therefore, constituted direct admissions, not collateral evidence. Appellant further says that the acts and declarations of one partner are not admissible until a prima facie case of partnership is established, citing Scott v. Scott, 265 S.W. 864 (Mo.App.1924), and Willoughby v. Hildreth, 182 Mo.App. 80, 167 S.W. 639 (1914). In Scott, there was no showing that the one sought to be charged as a partner had anything to do with the letterhead which was offered in evidence. It could not, therefore, have been an admission against his interest. The same was true as to two undelivered deeds. The Court merely said, as to the deeds, that a partnership " * * * cannot in the first instance be proved in this way." There was no evidence to connect the deeds with the supposed partner. We find nothing in the

holdings in Willoughby, supra, or in Chapin v. Cherry, 243 Mo. 375, 147 S.W. 1084 (1912), also cited, which is in any way persuasive in this situation. Certain rather loose statements have been made to the effect that the declarations of an alleged partner are not admissible until a partnership has been shown, prima facie; but these observations are clearly meant to refer only to statements *not* made by the one sought to be charged, and in fact made outside his presence. If made in his presence and not denied by him, or if made by him, as here, they are clearly admissions against the *declarant's interest*. There is no reason why in this instance we should depart from the universally accepted law concerning admissions against a declarant's interest. In this case, it should make no difference when the admissions were offered in evidence for they constituted material evidence in establishing the partnership, not mere corroboration. The signs were admissible as *acts* of Elwood against his interest. If it made any difference, which we think it does not, it fairly appears that the witness John Grissum had testified, before the photographs were offered, to admissions of the partnership by Elwood in the presence of Nora. The point is denied.

■ Defendant's last point is that the action is barred by the Statute of Frauds, § 432.010, because the supposed partnership agreement was an oral contract not to be performed within one year from the making thereof. It cites (some for the purpose of distinguishing them) Pointer v. Ward, 429 S.W.2d 269 (Mo.1968); Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024 (1912); Ellison v. Wood Garment Company, 286 S.W.2d 27 (Mo.App.1956); Pemberton v. Ladue Realty & Construction Company, 362 Mo. 768, 244 S.W.2d 62 (1951), and Waller v. Tootle-Campbell Dry Goods Company, 59 S.W.2d 751 (Mo.App. 1933). Much of defendant's argument relates to the principle referred to by the trial court that equity will disregard the Statute of Frauds where its application would work an unjust and deep-seated wrong or an indirect fraud upon the one against whom it is raised. The principle is enunciated in Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024 (1912), Pointer v. Ward, 429 S.W.2d 269 (Mo.1968), and other cases. Defendant seeks to show that the facts of this case do not call for the application of that doctrine. We deem it unnecessary to enter into that argument, for another recognized doctrine prevents the application of the statute in this case.

From the inception of this partnership agreement and for a period of perhaps 30 years Nora had performed her part to the letter,—continuing to the last possible date, namely, Elwood's death. That was her consideration, and it was ample. Likewise, the agreement was fully performed by Elwood throughout his lifetime. Sundry Missouri cases hold that the statute has no application to an oral contract where one of the parties has fully performed and the other has had the benefit of his performance; in such cases suit may be had at law. Deu Friend v. McDermott, 251 S.W.2d 339 (Mo.App.1952); Burk v. Walton, 337 Mo. 781, 86 S.W.2d 92 (Mo.1935); City of Springfield v. Koch, 72 S.W.2d 191 (Mo.App.1934); Whaley v. Milton Construction & Supply Co., 241 S.W.2d 23 (Mo.App.1951); Hyde v. Henman, 256 S.W. 1088 (Mo.App.1923); Schindler v. Sorbitz, 268 S.W. 432 (Mo. App.1925); 37 C.J.S. Frauds, Statute of, § 254; Pemberton v. Ladue Realty & Construction Company, supra, cited by defendant, recognizes this principle. Some authorities indicate that a part performance is sufficient, but all indicate that full performance by one party completely eliminates the operation of the statute. We may, and do, make the reasonable inference that Nora's performance was made and had in reliance upon the agreement of partnership; it was her only means of full protection.

■ If more were needed, we note that there is sound authority to the effect that the statute does not apply to an oral contract of partnership which fixes no definite

duration, since it is susceptible of dissolution within one year and becomes, in effect, a partnership at will. 1 Barrett & Seago, Partners & Partnership, pp. 313–314; 2 Rowley on Partnership, 2nd Ed., p. 26. The defense based upon the statute is denied.

In the caption of this case as it was filed here Nora Grissum as Executrix was still shown as a defendant. An Administrator ad Litem was appointed, he filed pleadings, and he appeared in defense of the action at the trial. We have entered an order substituting the Administrator ad Litem as a defendant in lieu of Executrix.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.